Michael W. Hawkins (0012707)
Jon B. Allison (0073955)
Attorneys for Defendant EyeMart Express, Ltd.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| M&S ADVISORY GROUP, INC., | : | Case No. C-1-02-522 |
| | : | |
| Plaintiff, | : | Judge Spiegel |
| | : | Magistrate Judge Hogan |
| v. | : | |
| | : | **DEFENDANT EYEMART EXPRESS** |
| EYEMART EXPRESS, LTD., | : | **LTD.'S MOTION FOR SUMMARY** |
| | : | **JUDGMENT** |
| Defendant. | : | |

     Defendant EyeMart Express, Ltd., pursuant to Federal Rule of Civil Procedure 56, moves this Court for summary judgment on Defendant's promissory estoppel and breach of contract claims as asserted in its Amended Counterclaim.  As set forth in the accompanying Memorandum in Support, there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law on its claims.

                                    Respectfully submitted,

                                      /s/ Michael W. Hawkins
                                      Michael W. Hawkins (0012707)
                                      Jon B. Allison (0073955)
                                      DINSMORE & SHOHL, LLP
                                      1900 Chemed Center
                                      255 East Fifth Street
                                      Cincinnati, Ohio  45202
                                      513/977-8200 (Phone)
                                      513/977-8141 (Fax)

                                      Trial Attorneys for Defendant,
                                      EyeMart Express, Ltd.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Robert A. Pitcairn, Jr., Esq.
> Wijdan Jreisat, Esq.
> Katz, Teller, Brant & Hild
> 255 East Fifth Street
> Suite 2400
> Cincinnati, Ohio 45202-4787

<u>/s/ Michael W. Hawkins</u>
Michael W. Hawkins (0012707)

Michael W. Hawkins (0012707)
Jon B. Allison (0073955)
Attorneys for Defendant EyeMart Express, Ltd.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| M&S ADVISORY GROUP, INC., | : | Case No. C-1-02-522 |
| | : | |
| Plaintiff, | : | Judge Spiegel |
| | : | Magistrate Judge Hogan |
| v. | : | |
| | : | **DEFENDANT EYEMART EXPRESS** |
| EYEMART EXPRESS, LTD., | : | **LTD.'S MEMORANDUM IN** |
| | : | **SUPPORT OT IS MOTION FOR** |
| Defendant. | : | **SUMMARY JUDGMENT** |

## STATEMENT OF POINTS AND AUTHORITIES

I.   INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF THE CASE ...................................................................... 2

    A.   EyeMart Considered Retaining A Consultant ......................................... 3

    B.   Sherman Made Many Promises To EyeMart ........................................... 4

    C.   The Consulting Agreement ...................................................................... 5

    D.   The Strategy Meeting .............................................................................. 6

    E.   Sherman Failed To Perform ..................................................................... 8

    F.   EyeMart Notified Sherman Of His Failure To Perform ......................... 9

    G.   Sherman Did Not Implement EyeMart's Strategic Plan ......................... 11

    H.   Sherman Acknowledged His Failure To Perform .................................. 13

    I.   The International Council Of Shopping Centers ..................................... 14

    J.   The Termination Of The Consulting Agreement ................................... 17

III. ARGUMENT ............................................................................................... 17

    A.   EyeMart Is Entitled To Summary Judgment On Its Promissory Estoppel Claim .... 17

        1.   Tersigni v. General Tire, Inc., 633 N.E.2d 1140 (Ohio App. 1993) ................... 17

        2.   Mers v. Dispatch Printing Co., 483 N.E.2d 150 (Ohio 1985) ........................... 17

    B.   EyeMart Is Entitled To Summary Judgment On Its Breach Of Contract Claim ...... 18

        1.   Garofalo v. Chicago Title Ins. Co., 661 N.E.2d 218 (Ohio App. 1995) .............. 18

        2.   National City Bank v. Erskine & Sons, 110 N.E.2d 598 (Ohio 1953) ................ 18

**IV. CONCLUSION**................................................................................................................20

## I.    <u>INTRODUCTION</u>

Defendant EyeMart Express, Ltd. ("EyeMart"), in its Amended Counterclaim, asserts claims of promissory estoppel and breach of contract against Plaintiff M&S Advisory Group, Inc. ("M&S").

EyeMart is in the retail optical eyewear business and maintains approximately sixty-five stores across the country.  Toward the end of 2001 and the beginning of 2002, EyeMart considered retaining a consultant to assist it in growing the company more quickly by adding store locations around the county.  EyeMart interviewed Martin Sherman, the sole owner and lone consultant of M&S.  During the discussions between EyeMart and Sherman, Sherman made many promises regarding what he would do for EyeMart as a consultant.  He promised that he would (1) fully negotiate leases for EyeMart, (2) enable it to open twelve to eighteen store locations within the first year of a Consulting Agreement, (3) obtain better lease rates than EyeMart otherwise could due to his reputation in the real estate development industry and his personal relationships with others in the industry, (4) get EyeMart into locations that they otherwise could not get into, (5) travel to scout out locations for EyeMart, (6) provide sales numbers of LensCrafters locations to assist EyeMart in selecting locations that would be the most profitable, and (7) devote the time necessary to ensure that EyeMart achieved its goals.  Sherman also told EyeMart that it should attend the International Council of Shopping Centers ("ICSC") in Las Vegas in May of 2002 and promised he would arrange for meetings between EyeMart and many of the major players in the real estate development industry at this convention.

In reliance upon Sherman's promises, EyeMart entered into a Consulting Agreement ("Agreement") with M&S.  Under the terms of the Agreement, Sherman was to act as EyeMart's

exclusive leasing agent and implement EyeMart's strategic plan with regard to selecting retail store locations and negotiating leases for spaces in those locations.

Shortly after the Agreement was executed, EyeMart and Sherman met for three days and together discussed and further developed the strategic plan. However, despite being well aware of EyeMart's strategic plan through participating in its development and through many communications from EyeMart orally and in writing, Sherman failed to take action to implement EyeMart's strategic plan. Over the course of several months, Sherman failed to provide information as promised. Also, Sherman failed to pursue locations on behalf of EyeMart, including those locations designated as priority locations. EyeMart notified Sherman in writing of his failure to pursue these locations, but to no avail. In addition, Sherman failed to arrange for meetings at the ICSC between EyeMart and major players in the real estate development industry. After nearly four months of non-performance by Sherman, EyeMart terminated the Agreement.

Based on the foregoing, Defendant EyeMart Express, Ltd. is entitled to summary judgment on its claims of promissory estoppel and breach of contract as it is evident that Plaintiff M&S Advisory Group, Inc., through its lone consultant Martin Sherman, failed to fulfill promises made to EyeMart and failed to perform under the terms of the Agreement.

## II.    <u>STATEMENT OF THE CASE</u>

EyeMart Express, Ltd. was founded in 1990 by H. Doug Barnes, O.D. (Barnes Depo. 6). EyeMart is in the retail optical eyewear business and maintains approximately sixty-five stores across the country, primarily concentrated in Texas and Oklahoma. (Barnes Depo. 7-8). Dr. Barnes is the owner and the President of EyeMart. (Barnes Depo. 7-8; Herskovitz Depo. 45). Jonathan Herskovitz and Frederick Grubb, both Senior Vice Presidents, and Mary Jo Samuelson, Chief Administrative Officer, report directly to Dr. Barnes. (Barnes Depo. 11, 16-17; Herskovitz

Depo. 45). Vickie Krall is a consultant who works closely with Dr. Barnes, Herskovitz, Grubb and Samuelson. (Herskovitz Depo. 45).

**A.      EyeMart Considered Retaining A Consultant.**

Toward the end of 2001 and the beginning of 2002, EyeMart began to consider growing its business (adding store locations around the country) more quickly than it had in the past. (Barnes Depo. 17-18; Grubb Depo. 8). During this time frame, EyeMart was working with a consultant by the name of Michael Packard who had been retained by EyeMart to assist it in its overall operations. (Barnes Depo. 19; Herskovitz Depo. 39). Packard suggested Dr. Barnes meet with and consider retaining as a consultant Martin Sherman, the founder, sole owner and lone consultant of M&S Advisory Group, Inc. (Barnes Depo. 19-22). Packard told Dr. Barnes that Sherman had headed the real estate department for U.S. Shoe and had negotiated over four thousand leases while working for U.S. Shoe. (Barnes Depo. 22). Dr. Barnes decided to interview Sherman, among others. (Barnes Depo. 18-20).

Prior to that time, Herskovitz and Grubb had been solely responsible for growing the company by adding store locations. (Barnes Depo. 33-34; Herskovitz Depo. 8-10). Although they each had multiple responsibilities with EyeMart, including many shared responsibilities, with regard to their responsibilities pertaining to growing the company, Grubb was largely responsible for site selection, operations and locating doctors for sites while Herskovitz was largely responsible for advertising, new store construction, operations and negotiating leases for the sites. (Barnes Depo. 33-34; Herskovitz Depo. 8-10; Grubb Depo. 6-8).

In January of 2002, Dr. Barnes, Herskovitz, Packard and Sherman were on a conference call to discuss the possibility of Sherman being retained as a consultant for EyeMart. (Barnes Depo. 23, 25; Herskovitz Depo. 15-18, 32-33; Sherman Depo. 84). Subsequently, there were multiple conversations, most of which were one-on-one conversations between Dr. Barnes and

Sherman, regarding EyeMart's strategic plan, the possible consulting arrangement and ultimately involving the negotiation of an agreement between M&S and EyeMart. (Barnes Depo. 28, 31-32, 35-36; Herskovitz Depo. 18-21; Sherman Depo. 84). During these conversations, Sherman represented that he had a great deal of experience in negotiating leases for entities like EyeMart. (Barnes Depo. 26; Herskovitz Depo. 56). In addition, prior to executing the Agreement, Sherman made a number of promises regarding what he would do for EyeMart in his capacity as consultant. (Barnes Depo. 23-34; Herskovitz Depo. 15-18, 32-33).

**B.    Sherman Made Many Promises To EyeMart.**

Sherman promised that he would (1) fully negotiate leases for EyeMart, (2) enable it to open twelve to eighteen store locations within the first year of the Consulting Agreement, (3) obtain better lease rates than EyeMart otherwise could due to his reputation in the real estate development industry and his personal relationships with others in the industry, (4) get EyeMart into locations it otherwise could not get into, (5) travel to scout out locations for EyeMart, (6) provide sales numbers of LensCrafters locations (which he had from his days working with LensCrafters) to assist EyeMart in selecting locations that would be the most profitable, and (7) devote the time necessary to ensure that EyeMart achieved its goals, including the goal of opening twelve to eighteen store locations within the first year of the Agreement. (Barnes Depo. 23-34, 52-54, 63-64; Herskovitz Depo. 15-18, 32-33, 59, 112-113). Sherman represented and promised that he would get EyeMart into specific locations, including the Barton Creek Mall in Austin, Texas and the North Star Mall in San Antonio, Texas. (Barnes Depo. 23, 150). Sherman represented that Herskovitz and Grubb could relinquish their responsibilities regarding negotiating leases. (Barnes Depo. 32-34; Herskovitz Depo. 32-33, 112-113).

During these conversations, Sherman also told Dr. Barnes that EyeMart should attend the International Council of Shopping Centers in Las Vegas in May of 2002. (Barnes Depo. 93-95,

156; Herskovitz Depo. 174, 178).  Sherman told Dr. Barnes that this would be the best

opportunity for Dr. Barnes to meet many of the major players in the real estate development

industry.  (Barnes Depo. 93-95, 156; Herskovitz Depo. 174).  Sherman promised Dr. Barnes that,

if Dr. Barnes attended, Sherman would arrange for meetings between Dr. Barnes and many of

the major players in the industry.  (Barnes Depo. 93-95, 156; Herskovitz Depo. 174, 178).

**C.    The Consulting Agreement.**

       In reliance upon Sherman's promises, an agreement was prepared and the Consulting

Agreement was executed effective February 1, 2002.  (Pl. Exh. 1[1]; Barnes Depo. 38; Herskovitz

Depo. 22).  The Agreement was for a duration of two years and, under its terms, EyeMart would

"retain Consultant on matters relating to the strategy of selecting retail store locations,

implementation of the strategy, and lease negotiations.  Consultant will act as EyeMart's

exclusive leasing agent for all locations.  Consultant shall make Martin Sherman available at

mutually agreed times and locations for such consultation and assistance as requested. . . .  The

parties anticipate that Martin Sherman will attend meetings at EyeMart headquarters as necessary

for the purpose of discussion of lease negotiations and ongoing site selection strategy."  (Pl. Exh.

1).

       Under the terms of the Agreement, EyeMart was to pay a "Basic Fee" of fifty thousand

dollars ($50,000.00) per year and a "Minimum Amount" of one hundred fifty thousand dollars

($150,000.00) per year.  (Pl. Exh. 1).  Sherman could receive additional monies if EyeMart

entered into or renewed a certain number of leases either during the term of the Agreement or

within one year after the termination of the Agreement.  (Pl. Exh. 1).  The Agreement "may be

terminated by either party for 'Cause' which shall be defined as the breach of any material

---

[1]    Pl. Exh. refers to the Exhibits Plaintiff introduced during the depositions of Dr. Barnes, Herskovitz and Grubb
       whereas Df. Exh. refers to the Exhibits Defendant introduced during the deposition of Plaintiff.  All Exhibits and
       Deposition Transcripts of EyeMart personnel are filed under seal pursuant to the Protective Order in this case.

provision of this Agreement by the other party, which breach is not cured within thirty (30) days after written notice thereof is delivered to such other party, or Consultant's failure by reason of his health to make Martin Sherman available on a continuing and active basis as principal to provide the services set forth hereunder."  (Pl. Exh. 1).

**D.**    **The Strategy Meeting.**

A few weeks after the execution of the Agreement, Sherman and Packard, who were both located in Cincinnati, Ohio, flew down to Dallas, Texas, which is where EyeMart's corporate headquarters is located, to meet with EyeMart representatives to discuss and further develop EyeMart's strategic plan.  (Barnes Depo. 47-49, 57; Herskovitz Depo. 38-39; Grubb Depo. 11-12; Krall Depo. 20-24; Sherman Depo. 93-94).  The meeting lasted three days, from February 18 to February 20, 2002, and attending the meeting were Packard, Sherman, Dr. Barnes, Herskovitz, Grubb and Krall.  (Barnes Depo. 47-48, 57; Herskovitz Depo. 38-39; Grubb Depo. 11-12). Other EyeMart representatives were in and out of the meeting briefly.  (Barnes Depo. 47-48; Herskovitz Depo. 38-39).

During the meeting, the group discussed and further developed EyeMart's strategic plan. (Barnes Depo. 48-70; Herskovitz Depo. 38-39; Grubb Depo. 12-13; Krall Depo. 20-24; Sherman Depo. 93-94).  EyeMart representatives wanted to focus on smaller towns (towns with populations of approximately two to five hundred thousand persons) where only one location was necessary to service the market, referred to as "secondary markets" or "single store markets."  (Barnes Depo. 49-50; Herskovitz Depo. 37-38, 46-48; Grubb Depo. 12-14).  EyeMart wanted to locate in malls, strip centers and free standing locations in these secondary markets. (Barnes Depo. 51-52; Herskovitz Depo. 180; Grubb Depo. 14-15).  Up to that time, EyeMart had mostly located in strip centers and free standing locations in secondary markets, having a couple of locations in malls, and had been successful with those locations.  (Barnes Depo. 52;

Herskovitz Depo. 37-38).  EyeMart's intention was to continue to pursue what had been a successful strategy.  (Barnes Depo. 49-52; Herskovitz Depo. 37-38).

EyeMart had already scouted and selected a number of specific locations it wanted Sherman to focus his efforts on in the initial weeks after the execution of the Agreement, including locations in Harrisburg (Paxton Towne Centre), York (York Galleria), and Lancaster (Park City Center Mall), Pennsylvania, locations in San Antonio (North Star Mall) and Austin (Barton Creek Mall), Texas, and a location in Champaign, Illinois.  (Df. Exh. 2; Barnes Depo. 49, 56-59; Herskovitz Depo. 38, 46-48, 58-59, 64, 78-82; Grubb Depo. 13; Sherman Depo. 108). EyeMart had even made some initial contacts on some of these locations.  (Df. Exh. 2; Barnes Depo. 61; Herskovitz Depo. 46-48, 58-59).  The highest priority locations were in Harrisburg, York and Lancaster.  (Df. Exh. 2; Barnes Depo. 56, 59, 61; Herskovitz Depo. 47, 58-59; Grubb Depo. 13).  With regard to all locations to be considered, the group created a reference list ranking cities in groups by order of priority.  (Df. Exh. 1; Barnes Depo. 58-60; Herskovitz Depo. 48-49; Grubb Depo. 13; Sherman Depo. 108).

During the strategy meeting, as he had in previous discussions with EyeMart, Sherman again promised EyeMart he would (1) fully negotiate leases for EyeMart, (2) enable it to open twelve to eighteen store locations within the first year of the Agreement, (3) obtain better lease rates than EyeMart otherwise could due to his reputation in the real estate development industry and his personal relationships with others in the industry, (4) get EyeMart into locations it otherwise could not get into, (5) travel to scout out locations for EyeMart, (6) provide sales numbers of LensCrafters locations, (7) and devote the time necessary to ensure that EyeMart achieved its goals, including the goal of opening twelve to eighteen store locations within the first year of the Agreement.  (Barnes Depo. 52-70; Herskovitz Depo. 112-113; Grubb Depo. 14-

18). Sherman also again told EyeMart representatives it was important that they come to the ICSC in Las Vegas in May of 2002 and Sherman again promised he would arrange for meetings between EyeMart and many of the major players in the real estate development industry. (Barnes Depo. 70; Herskovitz Depo. 174; Krall Depo. 26-27, 38).

Despite Sherman's promises, after EyeMart representatives met Sherman for the first time in Dallas at the strategy meeting in February, EyeMart representatives had their doubts and concerns about Sherman's capabilities. (Barnes Depo. 157; Herskovitz Depo. 79). During the strategy meeting, Sherman seemed absent minded and forgetful, failing to remember important pieces of a number of conversations he'd had with EyeMart representatives in the weeks preceding the strategy meeting. (Herskovitz Depo. 79, 213).

**E.    Sherman Failed To Perform.**

In the weeks following the execution of the Agreement and the strategy meeting in Dallas, EyeMart realized that Sherman was not performing under the Agreement and was not following through on the promises he made prior to the signing of the Agreement and during the strategy meeting. (Barnes Depo. 80-91, 129; Herskovitz Depo. 64-67; Grubb Depo. 73). EyeMart representatives had a lot of experience selecting locations, making contact with real estate developers, and negotiating leases, and they knew from experience Sherman was not performing under the Agreement and as promised. (Barnes Depo. 145-148; Herskovitz Depo. 8-10, 55; Grubb Depo. 36, 77; Krall Depo. 22).

For example, Sherman had represented to EyeMart that he had the sales volume numbers for LensCrafters stores all around the country as he had been associated with LensCrafters in the past. (Barnes Depo. 32, 62; Herskovitz Depo. 61-62). Although Sherman said he would provide information to EyeMart to assist EyeMart in determining how EyeMart might perform in similar locations in similar markets, the information Sherman provided was contradictory. (Herskovitz

Depo. 61-65).  Sherman would quote one sales number in a given conversation and then a different number in a subsequent conversation.  (Herskovitz Depo. 61-65).  When questioned about his inconsistency, Sherman provided no explanation.  (Herskovitz Depo. 61-65).  Consequently, EyeMart representatives realized that Sherman could not be relied on to provide accurate information.  (Barnes Depo. 91-92; Herskovitz Depo. 61-65).

In addition, it became apparent that Sherman was not pursuing the locations EyeMart had specifically designated as priority locations in early February, at the strategy meeting, and a number of times thereafter.  (Df. Exh. 2; Barnes Depo. 81-91; Herskovitz Depo. 64-67; Grubb Depo. 13, 26; Sherman Depo. 110, 115-116, 119-120).  EyeMart representatives, most often Herskovitz, telephoned Sherman nearly every day in late February, in March, and in April seeking to be updated on Sherman's progress with the priority locations.  (Barnes Depo. 74, 80-84; Herskovitz Depo. 35-36, 62, 64-67; Grubb Depo. 25-26, 31-32, 36-37).  Sherman, however, did not provide information on whether he had made any progress or on what steps he had taken to attempt to make any progress in pursuing these locations.  (Barnes Depo. 81-91; Herskovitz Depo. 64-67, 69, 106; Grubb Depo. 25-26, 37).  Instead, his consistent response to any inquiry regarding his alleged efforts on behalf of EyeMart was "I'm working on it."  (Barnes Depo. 83; Herskovitz Depo. 64-67, 69; Grubb Depo. 37).  Even when Grubb told Sherman he had doctors lined up for locations that would be lost if Sherman didn't make progress, and even when Herskovitz pressed Sherman for answers and told Sherman that Dr. Barnes was on his back for results, Sherman would only respond that Dr. Barnes should not worry because he was "working on it."  (Herskovitz Depo. 69, 102-105; Grubb Depo. 37; Sherman Depo. 167-168).

## F.    EyeMart Notified Sherman Of His Failure To Perform.

At the end of February, one month after the execution of the Agreement, three weeks after Sherman was instructed in writing to pursue specific priority locations, and after multiple

telephone conversations in which EyeMart requested updates on Sherman's progress in implementing EyeMart's strategic plan, Dr. Barnes instructed Herskovitz to begin sending Sherman written notices of Sherman's nonperformance and of what EyeMart wanted accomplished in case the Agreement had to be terminated due to Sherman's failure to perform. (Barnes Depo. 81-89; Herskovitz Depo. 69, 73, 75, 79-80, 88-89; Grubb Depo. 81-83).

From February to May of 2002, Herskovitz sent Sherman four written notices. (Barnes Depo. 45-46, 121-128; Herskovitz Depo. 75, 90, 105-109). On February 28, 2002, Herskovitz sent Sherman a notice personally signed by Dr. Barnes listing the locations EyeMart expected Sherman to pursue on its behalf. (Df. Exh. 6; Herskovitz Depo. 75, 90; Sherman Depo. 131). The list included the Park City Mall in Lancaster, Pennsylvania, the York Galleria in York, Pennsylvania, the Paxton Towne Centre in Harrisburg, Pennsylvania, the Barton Creek Mall in Austin, Texas, the North Star Mall in San Antonio, Texas, and a location in Champaign, Illinois among others. (Df. Exh. 6). On March 21, March 26 and April 16, 2002, Herskovitz sent Sherman notices regarding the same locations. (Df. Exhs. 9, 10 and 12; Herskovitz Depo. 105-109; Sherman Depo. 142, 147-148, 153-154).

In addition to and in connection with these written notices, Herskovitz continued to telephone Sherman several times a week to discuss Sherman's failure to make progress with regard to these locations. (Herskovitz Depo. 83-84, 94-95, 109). Despite the efforts of Herskovitz, however, during this entire time Sherman did not make progress on the locations EyeMart had designated as priorities from the beginning. (Barnes Depo. 73-74; Herskovitz Depo. 102-105). Instead, Sherman seemed to forget from day to day what he was supposed to be doing. (Herskovitz Depo. 36-37, 62-63, 213; Grubb Depo. 26). In fact, with regard to priority

locations, it was evident, even multiple months after the execution of the Agreement, that Sherman had done nothing at all.  (Barnes Depo. 73-74; Herskovitz Depo. 104; Grubb Depo. 73).

### G.    Sherman Did Not Implement EyeMart's Strategic Plan.

For example, Sherman never made an attempt to pursue the Paxton Towne Centre in Harrisburg, Pennsylvania, from February through April, even though it had been designated a priority location in early February.  (Aristone Depo. 6-7; Barnes Depo. 73-74, 84; Herskovitz Depo. 69-70, 83; Grubb Depo. 86; Sherman Depo. 110).  Herskovitz sent Sherman several written notices regarding this location and others and had asked Sherman a number of times over the course of those three months for Sherman's progress regarding this location among others. (Df. Exhs. 6, 9, 10; Herskovitz Depo. 69-70, 83).  Herskovitz finally decided to check into it himself on April 1.  (Barnes Depo. 73-74; Herskovitz Depo. 69-70, 83).  Herskovitz made a telephone call and found out the contact person for the Paxton Towne Centre was Joe Aristone. (Herskovitz Depo. 69-70, 83).  He then called Aristone who said that he had not spoken with Sherman and that he had never heard of EyeMart.  (Herskovitz Depo. 69-70, 83).  Two months after being told that the Paxton Towne Centre was a priority, Sherman had still not even made a telephone call regarding the location.  (Herskovitz Depo. 69-70, 83).  Herskovitz was shocked, but he nonetheless sent Sherman a fax identifying the contact person for the Paxton Towne Centre and instructing Sherman to contact that person, Aristone, to begin discussions for a space for EyeMart in the Paxton Towne Centre.  (Df. Exh. 11; Barnes Depo. 75; Herskovitz Depo. 69-70, 83, 108; Sherman Depo. 151).  Still, according to Aristone, Sherman never contacted him in April.  (Aristone Depo. 7).

In addition to his failure to perform regarding the Paxton Towne Centre, Sherman did not pursue the York Galleria, another priority location.  (Barnes Depo. 73-74; Herskovitz Depo. 71; Grubb Depo. 27-28, 85-86; Sherman Depo. 115-116).  Although Sherman had promised that he

would be traveling and scouting out locations for EyeMart, Sherman refused to accompany Grubb to Pennsylvania to look at locations in Harrisburg, York and Lancaster. (Barnes Depo. 61, 172-175; Grubb Depo. 72). In the interest of time, Grubb made the trip to Pennsylvania on his own in early April of 2002. (Barnes Depo. 61, 73-74, 173; Grubb Depo. 27-28). While Grubb's sole intention and responsibility was to meet with and recruit doctors in the area for EyeMart locations that EyeMart expected it would be opening in Harrisburg, York and Lancaster, Grubb had to assume site selection duties as well. (Barnes Depo. 61; Grubb Depo. 85-86).

During his trip, Grubb stopped in at the York Galleria, one of the locations EyeMart designated as a priority for Sherman in early February and consistently thereafter. (Barnes Depo. 74-78; Grubb Depo. 27-28, 85-86; Sherman Depo. 115-116). Grubb was surprised to find there were a number of spaces available for rent in the York Galleria. (Barnes Depo. 74-78; Herskovitz Depo. 71; Grubb Depo. 27-28, 85-86). For weeks Sherman had been telling EyeMart that there were no spaces available for rent in the York Galleria, but that he was using his relationships with developers to try to get EyeMart a space. (Barnes Depo. 74-78, 83-85, 95, 152, 156-157; Grubb Depo. 27-28, 85-86; Sherman Depo. 115-116). Grubb called Sherman and asked why Sherman had been telling EyeMart there were no spaces available when he was standing in front of several available spaces. (Barnes Depo. 83; Grubb Depo. 27-28, 85-86; Sherman Depo. 115-116). Sherman's only response was that Grubb had to be mistaken. (Grubb Depo. 27-28; Sherman Depo. 115-116). Grubb then spoke with the mall manager who had not spoken with Sherman and who had not heard of EyeMart. (Barnes Depo. 83-85; Herskovitz Depo. 71; Grubb Depo. 85-86). Sherman's representations to EyeMart for several weeks that there were no locations available in the York Galleria was not true and never explained.

The contact person in charge of leasing for the York Galleria, Lance Johnson, testified in his deposition that, although there were eight to ten locations available for rent and although he would have accepted any potential tenant for a space in the mall, Sherman did not contact him about EyeMart until approximately the end of April or the beginning of May of 2002.  (Johnson Depo. 5-6, 9, 24-25).

## H.    Sherman Acknowledged His Failure To Perform.

On Friday, May 10, Sherman and EyeMart representatives were on a call prompted by a bill EyeMart received for expenses relating to a trip Sherman took to Chicago allegedly to meet with a real estate developer, General Growth, about Crabtree & Evelyn (another client of Sherman), EyeMart and other of Sherman's clients.  (Herskovitz Depo. 95, 123-130).  EyeMart did not know that Sherman was going to make this trip and never received any report, either written or verbal, about Sherman's meeting with General Growth.  (Herskovitz Depo. 124-128, 137-138).  Herskovitz was on the phone with Sherman multiple times a week and Sherman never mentioned the trip.  (Herskovitz Depo. 128).  EyeMart representatives thought it strange that Sherman made this trip because EyeMart had recently met with General Growth on its own.  (Barnes Depo. 71-72; Herskovitz Depo. 124-127).  Thus, Sherman's meeting was duplicative.  (Herskovitz Depo. 127).  Now, EyeMart was being asked to pay for half of Sherman's expenses for his unnecessary trip to Chicago when it never knew he was going and never received any report on any meeting with General Growth.  (Barnes Depo. 76, 93; Herskovitz Depo. 124-128, 137-138).

Sherman was defensive about the trip and angry that EyeMart representatives questioned him about it.  (Herskovitz Depo. 131-134; Grubb Depo. 45-48).  Although he could not articulate a reason for the trip, he said, "I'm Marty Sherman" and "who are you to question what I do."

(Herskovitz Depo. 131-134, 136-138). Later in the conversation, Sherman acknowledged his failings on behalf of EyeMart and acknowledged that EyeMart was not happy with him. (Herskovitz Depo. 95, 132-136; Grubb Depo. 45-48; Sherman Depo. 161-163). Sherman said that mistrust had developed between he and EyeMart largely due to his failings, that he was no longer comfortable with the relationship and that the relationship was not working out. (Herskovitz Depo. 95, 132-136; Grubb Depo. 45-48; Sherman Depo. 161-163). At the conclusion of the conversation, EyeMart representatives Herskovitz, Grubb and Samuelson were under the impression that Sherman was terminating the Agreement. (Herskovitz Depo. 95, 136, 139-140, 143; Grubb Depo. 43, 49-50; Samuelson Depo. 55-56).

Over the weekend, Sherman called Herskovitz on his cell phone and attempted to take back much of what he had said. (Herskovitz Depo. 144-149). Then on Monday, Sherman spoke again with Herskovitz and Grubb and attempted to deny he had represented he wanted to terminate the relationship. (Herskovitz Depo. 157-161; Grubb Depo. 52-54). EyeMart representatives were extremely concerned at this point, given Sherman's failure to perform and his negative feelings about the nature of the relationship between he and EyeMart. (Herskovitz Depo. 140, 158-161, 173). Still, EyeMart representatives held out hope that Sherman could resurrect himself at the ICSC, which was only one week away, and where Sherman had promised to schedule many meetings for EyeMart with major players in the real estate industry. (Barnes Depo. 101; Herskovitz Depo. 173-174).

**I.    The International Council Of Shopping Centers.**

On May 19, Dr. Barnes, Herskovitz, Grubb, and Krall flew from EyeMart's corporate headquarters in Dallas to Las Vegas for the ICSC which was to take place from May 20 to May 22. (Barnes Depo. 98-99; Herskovitz Depo. 176; Grubb Depo. 58, 61-62; Krall Depo. 35).

EyeMart's representatives flew to Las Vegas with the expectation that Sherman would, as promised, have many meetings set up for EyeMart representatives to attend with major players in the real estate development industry.  (Barnes Depo. 93-98; Herskovitz Depo. 183; Grubb Depo. 58; Sherman Depo. 188-189).  The first morning of the convention, Dr. Barnes telephoned Sherman to ask where they should meet.  (Barnes Depo. 93; Sherman Depo. 189).  Despite the fact that Sherman knew Dr. Barnes would be attending the ICSC and had discussed his attendance with him as recently as one week earlier, Sherman acted surprised by the phone call, but invited Dr. Barnes to meet him in a conference room.  (Barnes Depo. 93; Krall Depo. 39).  Dr. Barnes, Krall, Herskovitz and Grubb all went to meet with Sherman, who was in a conference room with representatives for Crabtree & Evelyn, another of his clients.  (Barnes Depo. 93-94, Herskovitz Depo. 176).

When they arrived, Sherman requested that Herskovitz and Grubb step away and he proceeded to speak with Dr. Barnes and Krall.  (Barnes Depo. 109; Herskovitz Depo. 177; Grubb Depo. 61).  Sherman advised Dr. Barnes that he did not have any meetings set up for EyeMart during the convention, but he said that he would mention EyeMart's name in some of the meetings he had on behalf of Crabtree & Evelyn and that he would meet with Dr. Barnes for dinner that evening.  (Barnes Depo. 104-110; Herskovitz Depo. 177; Krall Depo. 43-44).  Dr. Barnes was shocked and he and Krall asked to see the list of meetings Sherman had set up for the convention.  (Barnes Depo. 103-106; Krall Depo. 43-44).  Sherman showed the list to Dr. Barnes and Krall.  (Barnes Depo. 103-106; Krall Depo. 43-44).  Dr. Barnes and Krall reviewed the list and found Sherman had filled his three-day convention schedule with half hour meetings for Crabtree & Evelyn.  (Barnes Depo. 103-110; Krall Depo. 43-44; Sherman Depo. 202).

The Crabtree & Evelyn representatives who were present at the ICSC, Robert Kelleher and Elizabeth Rice, confirmed in their respective depositions that, consistent with past practice, they were scheduled to spend the entire convention in meetings with Sherman.  (Kelleher Depo. 35-37, 44, 48, 53-55; Rice Depo. 17-19, 21, 24).  In fact, they did not even know EyeMart would be attending the convention.  (Kelleher Depo. 48; Rice Depo. 21).

Dr. Barnes was furious.  (Barnes Depo. 103-111; Herskovitz Depo. 177; Grubb Depo. 61-62; Krall Depo. 44).  He shouted at Sherman, "you don't have anything for us."  (Barnes Depo. 110; Sherman Depo. 193-194).  Sherman stated Dr. Barnes and Krall could attend a few of Crabtree & Evelyn's meetings.  (Barnes Depo. 106-110; Krall Depo. 44).  He said that Crabtree & Evelyn representatives would not object (which was not true[2]) and that he could mention EyeMart's name at the end of a few meetings.  (Barnes Depo. 106-110; Krall Depo. 44).  Dr. Barnes thought that was a ridiculous idea.  (Barnes Depo. 106-111; Krall Depo. 44-47; Sherman Depo. 193-194).  Barnes shouted that the convention was for "three days, we're paying half your money, half your travel expenses, and we're paying you all this money to go select locations, negotiate leases, you've been talking for months we're going to do all these deals out here,  and you don't have a meeting set up for us. . . . This is outrageous."  (Barnes Depo. 110-111).  With that, Barnes and Krall walked away.  (Barnes Depo. 106-111; Krall Depo. 44-47; Sherman Depo. 193-194).

Dr. Barnes then told Herskovitz and Grubb that there were no meetings set up for EyeMart.  (Barnes Depo. 112-113; Herskovitz Depo. 177; Krall Depo. 47).  They were stunned.  (Barnes Depo. 112-113; Herskovitz Depo. 177; Krall Depo. 47).  They discussed their shared expectation based on Sherman's promises that there were to be many meetings set up by

---

[2]   Kelleher testified in his deposition that it would be unusual for another of Sherman's clients to attend a meeting for Crabtree & Evelyn.  (Kelleher Depo. 36-37).

Sherman on behalf of EyeMart. (Barnes Depo. 112-113; Herskovitz Depo. 177, 183-184; Grubb Depo. 58; Krall Depo. 47). They decided, however, to use their time productively and they walked around the convention meeting with developers as availability allowed. (Barnes Depo. 114-117; Herskovitz Depo. 178; Grubb Depo. 62-64). Dr. Barnes called Sherman on his cell phone and left a message stating, "dinner is canceled and so are you." (Barnes Depo. 111-114; Herskovitz Depo. 184).

**J.    The Termination Of The Consulting Agreement.**

After the convention, Dr. Barnes wrote a letter to Sherman terminating the Agreement due to Sherman's failure to perform under the terms of the Agreement. (Barnes Depo. 128-132). Sherman, during the four-month period in which the Agreement was in effect, did not negotiate a single lease or get open even one of the twelve to eighteen stores on behalf of EyeMart as he had promised. (Barnes Depo. 76, 131; Herskovitz Depo. 188).

## III.    ARGUMENT

**A.    EyeMart Is Entitled To Summary Judgment On Its Promissory Estoppel Claim.**

The elements of a promissory estoppel claim are: (1) a promise made to the promisee; (2) reliance on the promise by the promisee; (3) the reliance is justified; and (4) the reliance caused a detriment to the promisee. See Tersigni v. General Tire, Inc., 633 N.E.2d 1140, 1142-1143 (Ohio App. 1993); Mers v. Dispatch Printing Co., 483 N.E.2d 150 (Ohio 1985).

In the instant action, all of the elements of a promissory estoppel claim are present. Sherman made many promises to EyeMart regarding what he would do for EyeMart to implement its strategic plan prior to entering into the Agreement with EyeMart. (Barnes Depo. 23-34, 52-54, 63-64, 93-95, 150, 156; Herskovitz Depo. 15-18, 32-33, 59, 112-113, 174, 178). Sherman reiterated those promises during the strategy meeting and throughout the relationship between EyeMart and M&S. (Barnes Depo. 52-70; Herskovitz Depo. 112-113, 174; Grubb

17

Depo. 14-18).  Sherman represented and promised that he would implement EyeMart's strategic plan by providing requested information, by getting EyeMart into locations EyeMart otherwise could not get into, by fully negotiating lease terms that were superior to terms EyeMart otherwise could negotiate and by meeting EyeMart's strategic plan of opening twelve to eighteen new store locations within the first twelve months following the execution of the Agreement.  (See supra Sections II B and D).  Sherman also promised that he would arrange for many meetings with major retail developers for EyeMart at the ICSC in Las Vegas in May of 2002.  (See supra Sections II B and D).  EyeMart justifiably relied to its detriment on these promises in entering into the Agreement, in attempting to work with Sherman after the execution of the Agreement, in attending the ICSC as well as other travel, in compensating Sherman, in hiring additional personnel, and in making additions to and upgrading EyeMart's headquarters.  Therefore, Defendant EyeMart Express, Ltd. is entitled to Summary Judgment on its Promissory Estoppel claim.

**B.    EyeMart Is Entitled To Summary Judgment On Its Breach Of Contract Claim.**

The elements of a breach of contract claim are: (1) the existence of a contract; (2) performance of contractual obligations by the nonbreaching party; (3) failure by the other party to fulfill contractual obligations without legal excuse; and (4) damages suffered by the nonbreaching party as a result of the breach.  See Garofalo v. Chicago Title Ins. Co., 661 N.E.2d 218 (Ohio App. 1995); National City Bank v. Erskine & Sons, 110 N.E.2d 598 (Ohio 1953).

In the instant action, each of the elements are met.  The Agreement was entered into on February 1, 2002.  (Pl. Exh. 1).  EyeMart met its obligations under the Agreement by paying Sherman amounts pursuant to the terms of the Agreement.  M&S, however, breached the Agreement causing damage to EyeMart.

Under the Agreement, M&S was to act as EyeMart's exclusive leasing agent for all locations and it was to make Sherman available at mutually agreed times and locations as requested to implement EyeMart's strategic plan by selecting retail store locations and by negotiating leases for those locations. (Pl. Exh. 1). Sherman was well aware of EyeMart's strategic plan. Sherman had, after all, discussed the strategic plan with Barnes prior to the execution of the Agreement and participated in a three-day meeting during which the strategic plan was discussed and further developed. (Barnes Depo. 23-34, 47-49, 52-54, 57, 63-64; Herskovitz Depo. 38-39; Grubb Depo. 11-12). During the strategy meeting, a reference list was created ranking cities in groups in order of priority and Sherman had a copy of this list for his use. (Df. Exh. 1; Barnes Depo. 58-60; Herskovitz Depo. 48-49; Grubb Depo. 13). Additionally, at the time of the strategy meeting, EyeMart had already scouted and selected a number of specific locations it wanted Sherman to pursue and had advised Sherman of such locations. (Df. Exh. 2; Barnes Depo. 49, 56-59; Herskovitz Depo. 38, 46-48, 58-59, 64, 78-82; Grubb Depo. 13). Also, Sherman was aware through various communications from EyeMart, including written notices, that the highest priority locations were in Harrisburg, York and Lancaster, Pennsylvania. (Df. Exhs. 2, 6, 9, 10 and 12; Barnes Depo. 56, 59, 61, 74, 80-84; Herskovitz Depo. 35-36, 47, 58-59, 62, 64-67; Grubb Depo. 13, 25-26, 31-32, 36-37). Sherman testified in his deposition that EyeMart's priorities were his priorities. (Sherman Depo. 33). Sherman, however, did none of the things required of him under the Agreement.

Sherman failed to implement EyeMart's strategic plan by failing to provide information as requested, by failing to pursue locations, including locations EyeMart had designated as priority locations, and by failing to arrange for meetings at the ICSC between EyeMart representatives and major players in the retail development industry. (See supra Sections II E, F,

G, H, and I). Sherman's breaches caused damage to EyeMart in the form of compensation to

Sherman, compensation to additional personnel hired, monies spent on construction of additions

and upgrades to EyeMart's headquarters, travel expenses, and in time spent by EyeMart

employees performing tasks Sherman failed to and was paid to perform. Therefore, Defendant

EyeMart Express, Ltd. is entitled to Summary Judgment on its breach of contract claim.

## IV. CONCLUSION

For all of the foregoing reasons, Defendant EyeMart Express, Ltd. is entitled to Summary

Judgment on its promissory estoppel and its breach of contract claims as set forth in the

Amended Counterclaim.

Respectfully submitted,

/s/ Michael W. Hawkins
Michael W. Hawkins (0012707)
Jon B. Allison (0073955)
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
513/977-8200 (Phone)
513/977-8141 (Fax)

Trial Attorneys for Defendant,
EyeMart Express, Ltd.

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2004, I electronically filed the foregoing with the Clerk of the
Court using the CM/ECF system which will send notification of such filing to the following:

Robert A. Pitcairn, Jr., Esq.
Wijdan Jreisat, Esq.
Katz, Teller, Brant & Hild
255 East Fifth Street
Suite 2400
Cincinnati, Ohio 45202-4787

/s/ Michael W. Hawkins
Michael W. Hawkins

951203v1