1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4    - - - - - - - - - - - - - -
     M&S ADVISORY GROUP, INC.,    :
5
              Plaintiff,          :
6        vs.                      :    Case No.C-1-02-522
                                  :    (Judge Spiegel)
7    EYEMART EXPRESS, LTD.,       :
                                  :
8             Defendant.          :
     - - - - - - - - - - - - - -

9

10

11         Telephone deposition of MONICA C. SMITH,

12   deponent herein, called by the Plaintiff for direct

13   examination, pursuant to the Federal Rules of Civil

14   Procedure, taken before me, Lisa L. Weisenberger, a

15   Registered Professional Reporter and Notary Public

16   in and for the State of Ohio, at the offices of

17   Dinsmore & Shohl, 1900 Chemed Center, 255 East Fifth

18   Street, Cincinnati, Ohio, on Wednesday, February 18,

19   2004, at 5:42 p.m.

20

21

22

23

24                    **ORIGINAL**

2

1    APPEARANCES:

2        On behalf of the Plaintiff:

3            Wijdan Jreisat, Esq.
             Katz, Teller, Brant & Hild
4            2400 Chemed Center
             255 East Fifth Street
5            Cincinnati, Ohio  45202-4787
             Phone:  (513) 721-4532
6
         On behalf of the Defendant:
7
             Jon B. Allison, Esq.
8            Dinsmore & Shohl
             1900 Chemed Center
9            255 East Fifth Street
             Cincinnati, Ohio  45202-3172
10           Phone:  (513) 977-8200

11       Also present: Jonathan Herskovitz, EyeMart

12                        – – –

13

14

15

16

17

18

19

20

21

22

23

24

3

S T I P U L A T I O N S

1

2        It is stipulated by and between counsel for the

3   respective parties that the deposition of MONICA C.

4   SMITH, deponent herein, called by the Plaintiff for

5   direct examination pursuant to the Federal Rules of

6   Civil Procedure, may be taken at this time by the

7   notary; that said deposition may be reduced to

8   writing in stenotype by the notary, whose notes may

9   then be transcribed out of the presence of the

10  witness; and that proof of the official character

11  and qualifications of the notary is expressly

12  waived.

13                              - - -

14

15

16

17

18

19

20

21

22

23

24

4

1                            INDEX

2    Examination of **MONICA C. SMITH**          Page

3    By Ms. Jreisat                               5

4    By Mr. Allison                               28

5                         - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1          (Witness sworn.)

2          MS. JREISAT:  For the record, the parties

3      have stipulated that the court officer who

4      administered the oath and who is transcribing

5      the deposition is, obviously, an Ohio notary

6      and is present here with Counsel; whereas, the

7      witness is currently in Chicago, Illinois.  The

8      parties have stipulated that there are no

9      objections to that.  Is that correct,

10     Mr. Allison?

11         MR. ALLISON:  Yep.

12              MONICA C. SMITH,

13     having been duly sworn, was examined and testified

14     as follows:

15              DIRECT EXAMINATION

16     BY MS. JREISAT:

17         Q.   Ms. Smith, I introduced myself earlier.  I

18     am Wijdan Jreisat.  Would you state your name for

19     the record, please.

20         A.   Monica C. Smith.

21         Q.   And would you provide us with an address

22     for you?

23              THE WITNESS:  Yes.  Could you share with

24         me who all is involved with the call?

6

```
 1              MS. JREISAT:  Oh, I apologize.  This is

 2         Wijdan Jreisat speaking.  We have the court

 3         reporter here; Mr. Jon Allison, who is the

 4         attorney for EyeMart Express --

 5              THE WITNESS:  Okay.

 6              MS. JREISAT:  -- and we have Jonathan

 7         Herskovitz on the line by phone.

 8              THE WITNESS:  All right.

 9              MS. JREISAT:  Okay?

10              THE WITNESS:  All right.

11    BY MS. JREISAT:

12         Q.   Could you provide us with an address for

13    you?

14         A.   Sure.  Sure.  The work address is

15    Wilmorite Properties, 200 South Wacker -- and that

16    is on the 31st floor -- in Chicago, Illinois  60606.

17         Q.   And is Wilmorite Properties your current

18    employer?

19         A.   Yes.

20         Q.   Who did you work with prior to Wilmorite

21    Properties?

22         A.   L&H Real Estate Group.

23         Q.   And how long did you work for L&H?

24         A.   Two years.  I worked for them at two
```

7

1   points, but the last time I worked for them for two

2   years.

3        Q.    Okay.  And prior to L&H who did you work

4   for?

5        A.    General Growth Properties.

6        Q.    What is your current employment?

7        A.    What do you mean?

8        Q.    What do you do?

9        A.    Oh, I am a leasing representative for

10  Wilmorite Properties, and we are an account-based

11  company.  So I have several accounts that I work on.

12  We have about 17 shops and centers that we own.

13       Q.    And when you worked for L&H Properties and

14  General Growth, were you also a leasing

15  representative for them?

16       A.    Yes.  Yes.

17       Q.    How long have you been a leasing

18  representative?

19       A.    Let's see.  Since 1997.  Seven years.

20       Q.    And I would like to direct your attention

21  to the year 2002.  During that year who were you

22  working for?

23       A.    2002 I had two employers.  I worked at

24  L&H -- no.  Wait.  Let me get my dates right.  2002?

8

```
 1   When did I start here?  This is '04.  I started here

 2   in April of 2002.  And then before then I was with

 3   L&H Real Estate Group.

 4        Q.   Okay.  Do you know M&S Advisory Group?

 5        A.   Yes.

 6        Q.   Do you know Mr. Martin Sherman?

 7        A.   Yes.

 8        Q.   How long have you known Mr. Sherman?

 9        A.   I have known him for a couple of years.

10   Actually, we did -- the first deal I did with him

11   was at Park Plaza Mall, which is in Little Rock,

12   Arkansas, and that is when I was at L&H, and at the

13   time they managed it.  And that was the first -- it

14   was a renewal.  So that was the first deal that I

15   actually did with him.

16        Q.   And have you had occasions to deal with

17   Mr. Sherman since then?

18        A.   Yes.

19        Q.   Did you have any contact with M&S Advisory

20   Group or Mr. Sherman regarding any business for

21   EyeMart Express?

22        A.   Yes.

23        Q.   When did that take place?

24        A.   It took place in '02.  Let me look here in
```

9

1   my notes and see when we first spoke about it.

2   Okay.  I have in my notes February 25th, '02.

3      Q.    And what happened on February 25th, '02?

4      A.    He told me about a new concept he was

5   handling called EyeMart Express.  He mentioned that

6   they were a little bit more fashionable than a

7   LensCrafters.  He said they needed 3,500 square

8   feet, and they averaged about 1.4 million in sales.

9   That they would average about 1.4 million in sales.

10     Q.    And did you discuss specific properties

11  that could be potential locations for EyeMart

12  stores?

13     A.    Yeah.  I mean, at the time I was working

14  on three centers.  So we spoke about Pecanland Mall

15  in Monroe, Louisiana; we also spoke about Park Plaza

16  in Little Rock, Arkansas; and then I had a shared

17  duty with Glenbrook Square in Ft. Wayne, Indiana.

18  And that is the deal we were actually able to close.

19     Q.    Okay.  But you discussed all three malls

20  with Mr. Sherman?

21     A.    Yes.  Yes.

22     Q.    Okay.  Let me direct your attention to the

23  Glenbrook Square Mall.  Did L&H represent that mall

24  at that time?

10

1    A.    Yes, we did.  They did, yes.

2    Q.    And did Mr. Sherman contact you about

3  leasing space at that mall for EyeMart Express?

4    A.    I don't recall who contacted who, but we

5  had a conversation about it.  And Marty and I sort

6  of kept in contact.  Every now and then I would call

7  him and say, "Hey, what is going on?  Any folks" --

8  you know, "any people you are representing?"  And he

9  mentioned that, you know, he was representing a new

10  concept.

11        So that is -- you know, I don't remember

12  who actually initiated the phone call, but the

13  outcome was he mentioned that he had a new entity

14  that he was representing.

15    Q.    Did L&H end up negotiating for space at

16  the Glenbrook Square Mall with EyeMart?

17    A.    Yes.

18    Q.    Did you do that -- were you involved in

19  those negotiations?

20    A.    Yes.  I did it.  I did the deal.

21    Q.    Okay.  And when you say you did the deal,

22  what did you do?

23    A.    Well, I pretty much, you know, got him the

24  information he needed on the center.  But he was,

11

1  you know, somewhat familiar with the center as well

2  because he has been in the industry for quite some

3  time.  So we discussed numbers on Glenbrook, got him

4  a proposal, you know, negotiated, got it approved,

5  and got leases out.

6      Q.   Okay.  Do you recall how long that process

7  took?

8      A.   It went really quick because Marty is one

9  of the few people in the business that can, you

10  know, sort of get to the bottom line pretty quickly

11  and know if you are going to have a deal or not.  So

12  it wasn't something that drug on for a long time.

13          Let's see.  I think we probably finalized

14  everything in about a week or two.

15      Q.   Were you aware of EyeMart prior to your

16  contact with Mr. Sherman about it?

17      A.   No.  I hadn't heard of them.

18      Q.   Okay.  Subsequent to the negotiation of

19  the Glenbrook Square Mall lease, did you have any

20  other discussions with Mr. Sherman regarding any

21  other spaces for EyeMart?

22      A.   Yeah.  We talked about Park, and I -- I am

23  referring back to my notes here and my database.  I

24  quoted him a rent number for Park Plaza.  And then

12

1  Pecanland, he said that there would be a problem.

2  There would be an issue getting doctors there.  But

3  I did quote him rent and TA as well for Pecanland.

4      Q.    Are you familiar with the International

5  Council of Shopping Centers?

6      A.    Yes.

7      Q.    And are you a member of that organization?

8      A.    Yes.

9      Q.    Can you explain to me what that

10  organization is?

11      A.    It is -- International Council of Shopping

12  Centers is basically what the name says.  It is an

13  international organization that is sort of the --

14  sort of the father of the industry.  And they are

15  responsible for sort of putting together all of the

16  conventions that we go to to meet and make deals

17  with retailers and vice versa.

18          And they also publish several different

19  types of publications.  They publish a monthly

20  Shopping Center Today that sort of keeps everybody

21  abreast of what is going on in the industry.  And

22  they also offer classes, and they also offer, you

23  know, different sorts of certifications and sorts of

24  research.  And, you know, it is the main

13

1    organization for our industry pretty much.

2        Q.    Okay.  Did you attend the ICSC convention

3    in Las Vegas in May of 2002?

4        A.    Yes.

5        Q.    Did you have any appointments scheduled

6    with Mr. Sherman at that convention?

7        A.    Yes, I did.

8        Q.    Was that appointment scheduled before the

9    convention?

10       A.    Yes.

11       Q.    And what was the purpose of that

12   appointment?

13       A.    Well, at that time in 2002, I had just

14   started with Wilmorite, so I was -- I was an account

15   base.  I was responsible for two centers:

16   Charlestown Mall in St. Charles, Illinois, and West

17   Shore Mall in Holland, Michigan.  And I called him

18   up to talk to meet with him to talk about Crabtree &

19   Evelyn and also EyeMart.

20       Q.    Okay.  Were you specifically to discuss

21   EyeMart business at that appointment?

22       A.    Yes.  Yes, that is what I have in my

23   notes.

24       Q.    Did Mr. Sherman keep that appointment with

14

1   you?

2       A.   Yes, he did.

3       Q.   Did anyone from EyeMart attend that

4   meeting with him?

5       A.   No.

6       Q.   Do you recall what you discussed at that

7   meeting?

8       A.   We discussed Crabtree in Charlestown, and

9   he said he probably was -- oh, I can't tell the

10  details of the meeting.  But we discussed Crabtree

11  in Charlestown.  And then he passed on West Shore

12  and Charlestown for EyeMart.

13      Q.   Okay.  Do you recall any other discussions

14  regarding EyeMart at that meeting?

15      A.   No.  That was pretty much it.  They

16  weren't the type of centers that they were looking

17  for, and so they passed.  He passed on it.

18      Q.   Okay.

19      A.   I wasn't surprised considering, you know,

20  that they went into Glenbrook Square, which is an A

21  center, and the centers that I was pitching were C

22  centers.  So I wasn't surprised.

23      Q.   Are you familiar with Mr. Sherman's

24  reputation in the retail leasing business?

15

1      A.   Yes.

2      Q.   How are you familiar with that reputation?

3      A.   Just being in the business for several

4   years.  People talk.

5      Q.   What is his reputation?

6      A.   Well, the people that are close to me,

7   they think very highly of him.

8      Q.   How do you mean?

9      A.   Well, he gets the deals done, and he is a

10   nice guy, but he is also very straight and to the

11   point.  You know, people respect that.

12      Q.   Was it important to you that he was

13   involved in negotiations on behalf of EyeMart?

14      A.   Oh, yeah.  I mean, once -- you know, once

15   he said to me, you know, he was representing this

16   new tenant -- I knew if he was representing them,

17   they had to have a pretty significant amount of

18   credibility.  So even in selling the deal, I pretty

19   much told the folks there, "Look, Marty Sherman is

20   representing them.  His name goes a long way.  I am

21   considering the kind of clients he has."

22      Q.   What do you mean, "selling the deal"?

23      A.   Well, I have to sell deals to my

24   committee.  Once I negotiate the deal with the

16

1  tenant or the broker, or the tenant rep, in this

2  case, I still have to go to my committee.  Which at

3  the time at Landau was the president or CFO, blah,

4  blah, blah.  And, you know, that deal still has to

5  be sold, because, you know, it is their real estate.

6  And then they have to sell it to the owners of the

7  mall.

8      Q.    So do you have instances where you might

9  negotiate a deal with somebody, and then when you go

10  to the committee to try to sell them on the deal,

11  they decide to pass?

12      A.    Sure.  It happens.  Not often with me, but

13  it does happen.

14      Q.    Okay.  And why is it that you were able to

15  use Mr. Sherman's involvement with EyeMart to sell

16  the deal to L&H?

17      A.    Well, I had to use it because they were a

18  concept that no one had heard of.  We were putting

19  them in our premiere center.  At the time at Landau,

20  Glenbrook Square, you know, had been pretty much

21  their baby and their signature property forever.

22  And to pretty much go to them and say, "Hey, guess

23  what?  I have this new concept.  Sorry I can't

24  really show you any pictures, but it is going to be

17

1   really good.  Trust me on this."  You know, I had to

2   obviously say, "And also, Marty Sherman is

3   representing it."

4       Q.   So would it be fair to say that

5   Mr. Sherman's involvement with EyeMart was

6   essentially a stamp of approval of that company as a

7   tenant at your mall?

8       A.   It got it done a lot quicker.  I mean, if

9   he weren't involved or if it wasn't someone of his

10  caliber involved, I would have had to do a lot more

11  footwork and a lot more selling.  And they would

12  have wanted to see, you know, I think, a lot more

13  backup to prove the deal with a center such as

14  Glenbrook.

15      Q.   Like what?

16      A.   Well, I would have, obviously, had to go

17  meet with the tenant.  I would have had to have seen

18  some of the locations.  I would have called and

19  gotten some references.  We would have done a really

20  pretty significant background check as far as

21  credit.  And I would have just had to have gotten

22  really warm and fuzzy with them.

23      Q.   So is it possible that if EyeMart had

24  approached you without Mr. Sherman, you may not have

18

1  been willing to discuss entering into a lease

2  agreement for Glenbrook Square with them?

3      A.   I would have still discussed it.  It just

4  would have taken a lot more time.  And I don't know

5  if the excitement level would have been there like

6  it was.  Because I knew with him calling me, I knew

7  it was a real deal.

8          And, you know, I get calls all of the time

9  from folks who want to go into the mall.  And you go

10 through, you know, the whole dog and pony show,

11 presenting it to your folks, and the deal doesn't

12 happen.  Especially if it is folks who haven't been

13 in a mall before.  Because there is a huge learning

14 curve.  There is a big difference, you know, going

15 into a shopping center if you haven't done it

16 before.

17      Q.   How do you mean?

18      A.   It is a totally different environment.

19 You know, I don't even honestly remember, it has

20 been so long, if they had -- I am trying to think

21 what kind of store.  I think they had freestanding

22 stores or -- I don't even know.  I honestly don't

23 remember because it has been a couple of years.  I

24 am trying to remember what exactly.  He told me what

19

1    they were before they entered into malls.  But I

2    know they didn't have any mall deals at the time.

3    But it is a totally different animal.

4         If someone is in a freestanding or if they

5    are in a strip center, they have to be accustomed to

6    being into a 1-million, 2-million-square-foot

7    project.  You have to market differently.  You have

8    got to really understand who your competition is in

9    the mall.  You know, it is me being on the phone for

10   hours trying to tell you the differences and the

11   things that are important going to the mall.

12        Q.   In general, how often have you dealt with

13   Mr. Sherman in negotiating leases?

14        A.   We did one deal.  We did the renewal for

15   Park Plaza Crabtree & Evelyn.  And that was the only

16   deal that actually got -- that we actually did.

17        Q.   You mentioned that when he called, you

18   knew it was a real deal.  What do you mean about

19   that?

20        A.   Because I knew -- with his reputation, I

21   mean, I knew he wouldn't be wasting his time or my

22   time with something that wasn't real.  The reason it

23   happened so quickly is because I gave it my full

24   attention because I knew it was a deal I could get

20

1   done quickly because he knew what he was doing.

2       Q.    Did it also affect what kind of terms you

3   offered?

4       A.    Yeah.  I mean, I knew I wouldn't be able

5   to pull the wool over his eyes.  So, you know, there

6   are certain things I know that I probably would not

7   be able to get.  As opposed to things that I would

8   be able to get from someone who has never been in a

9   mall before.

10           Unfortunately, there are many folks in the

11  business that when they see someone who hasn't been

12  in malls before, they see a local person coming, you

13  know, it is -- they take them for everything they

14  have.  And I have seen it happen a lot, and it is

15  really unfortunate.  I have seen a lot of people

16  file bankruptcy, not make it, because they get into

17  these malls; they get into the wrong locations; they

18  get deals that are too aggressive; they are not

19  looking at the total occupancy; they are not looking

20  at the fact that it is going to take them time to

21  get up and running; many of them forget that they

22  have to market.  You know, it is tons and tons and

23  tons and tons of different problems.

24           And unfortunately, as I said, a lot of

21

1  developers know that.  And many of them get it stuck

2  to them, and they usually end up paying really

3  outrageous rent, and they don't ask for things that

4  they should.

5      Q.   And in your dealings with Mr. Sherman on

6  behalf of EyeMart, did you see any of those

7  problems?

8      A.   No.  I think the deal that we put together

9  was very fair considering that it is an A-plus

10  center.  And I think we both knew that.  So there

11  was no reason to haggle and nickel or dime.  If I

12  recall, there wasn't any TA in the deal.  Which for

13  a center such as Glenbrook, that is not unheard of.

14  And there really didn't necessarily have to be.

15          So we were able to get the deal done

16  quickly because he understood it was a really good

17  center and it was a good opportunity for them.  And

18  so it went very quickly and very smoothly.  And when

19  you have someone that is seasoned and that is really

20  good at what they do, the deals will go quick.

21  Because they know what the perimeters are and they

22  know what malls they need to be in, and they know

23  who they need to talk to.  Not only what malls, but

24  they know where they need to go in the mall.

22

1    Q.   Would you consider Mr. Sherman such a

2  person?

3    A.   Yeah.  Yeah.

4    Q.   Is there anything else that you recall or

5  that is significant about your dealings with

6  Mr. Sherman on behalf of EyeMart?

7         MR. ALLISON:  I would object to the form

8     of the question.

9    A.   I'm sorry.  Should I answer that or no?

10    Q.   You can answer it.  Or strike that.  I

11  will rephrase.

12         Do you recall anything else about your

13  dealings with Mr. Sherman on behalf of EyeMart?

14         MR. ALLISON:  I still object to the form.

15    Q.   You can answer.

16    A.   I just heard someone say they object.  So

17  should I answer or no?

18    Q.   Yeah, you are allowed to answer.  This is

19  a deposition.  So he has to do that for the record,

20  but you are allowed to answer.

21    A.   Oh, okay.  I guess I would just reconfirm

22  what I said before.  It went very quickly and

23  smoothly because, you know, who he is.  And, you

24  know, I -- just as he is, I think that is why he

23

1  enjoys working with me because I am the same way.

2  And he was, you know, very professional and great

3  with follow-up, and, you know, we got it done.

4      Q.    Would you say that the leasing business --

5  in the leasing business, are relationships

6  important?

7      A.    Extremely.

8      Q.    And why is that?

9      A.    Because there are hundreds of malls in

10  this country.  And there are really good malls in

11  the country.  There are a lot of really good ones.

12  And especially in the type of economy that we have

13  today, I mean, you just don't -- you know, the open

14  to buys are getting smaller and smaller and smaller

15  and smaller.  And --

16      Q.    I'm sorry.  I missed -- you said -- is it

17  the open --

18      A.    Open to buys.  Meaning, for example,

19  EyeMart, let's say, two years ago they were willing

20  to do 40 stores, but because of, you know, the

21  economy, they have decided to slash it to 20 stores.

22  So what you are finding is you are seeing a lot of

23  uses and a lot of people not only filing bankruptcy,

24  but you are seeing people who are doing deals.

24

1  Quite a few of them are either not opening the

2  stores, they are pulling back altogether, or they

3  are making them smaller, or they have decided that

4  they are going to do a smaller, a lesser, amount.

5  And that has been happening for the last couple of

6  years.

7       So the relationships are important

8  because -- for example, with myself, you know, if I

9  am getting calls all day, all day, all day, and if

10 it is someone I have a relationship with, I know

11 that they are good at what they do, I know they can

12 get the deal done, I know they know how to close

13 it -- a lot of people don't know how to close the

14 deals in this business, believe it or not -- that is

15 going to be the first person I call back.  And, you

16 know, especially if I enjoy speaking with them and

17 they are a pleasant person.  Because you want to

18 enjoy what you do.

19      So the relationships are very, very,

20 important.  Opposed to, you know, a couple of other

21 people calling you and you really don't know who

22 they are.  I mean, I will call them back, but they

23 may not get the call back, you know, right that

24 second.  They may get it back the next day or the

25

1    next couple of days.

2        Q.    And is there -- the trial in this matter

3    is scheduled for September 2004.  Do you have any

4    plans to be in Cincinnati at that time?

5        A.    No.  I think I am going to pass.  I will

6    actually be at the Olympics.

7        Q.    Oh, that sounds like a lot more fun, I

8    would say.

9        A.    Yeah.  Yeah.

10        MS. JREISAT:  I believe that is all I have

11        for you right now.

12        THE WITNESS:  All right.

13        MR. ALLISON:  I would like to confer with

14        my client momentarily.  And then I will come

15        back, and I may have a few.

16        MS. JREISAT:  Okay.

17        (Recess taken:  6:04 p.m. to 6:09 p.m.)

18        MR. ALLISON:  We can go back on the

19        record.

20        MS. JREISAT:  Yeah.  Jon, actually, if you

21        don't mind.  I have a real quick question, if

22        you don't care.

23        MR. ALLISON:  Okay.  Go ahead.

24

26

1    BY MS. JREISAT:

2        Q.    Ms. Smith, in your experience as a leasing

3    representative, have you dealt with any other

4    leasing consultants other than Mr. Sherman?

5        A.    Yes.

6        Q.    And when you generally negotiate with

7    those consultants, what is -- what portion of the

8    deal are they responsible for?

9        A.    They are responsible for initiating the

10    deal, helping to -- "initiating" meaning as far as

11    sort of choosing those locations that they feel

12    would be the best locations and spaces in centers

13    for their client.  And then we negotiate the

14    economics of the deal and the term and the proposal.

15    And at that point, typically, the retailer will

16    negotiate the lease.

17            And then the tenant rep will get involved,

18    you know, if we hit a snag or something like that.

19    But usually they are glad to be out of it.  They get

20    to do the fun part and negotiate the space and the

21    proposal.  And most clients -- you know, they

22    prefer -- they have their own in-house legal

23    department, or they have their own legal folks that

24    they contract out, and they -- you know, they prefer

27

1    to use their own people to negotiate the lease.

2        Q.    So the leasing consultant essentially

3    discusses and negotiates with you the basic terms of

4    the lease and then --

5        A.    Yeah, we will finalize the proposal with

6    the tenant rep.  And then once that -- once it is

7    approved on the landlord's side, at that point it

8    is -- you know, the baby becomes the retailer's.

9        Q.    Okay.  So then at that point the

10   negotiation of the lease itself turns to the

11   retailer, in your experience?

12       A.    Typically.

13       Q.    Okay.  And is that the way it went in the

14   negotiations on behalf of EyeMart?

15       A.    Yeah, that is how it went.  But I have to

16   tell you, I was not there for the opening of the

17   store because I left.

18       Q.    Oh, that is right.  I think you mentioned

19   you left in April?

20       A.    Yeah.

21       Q.    Okay.

22       A.    Yeah.

23       MS. JREISAT:  Okay.  Thank you.  That is

24       all I have for now.

28

1                    CROSS-EXAMINATION

2    BY MR. ALLISON:

3        Q.   I just have a few, Monica.  This is Jon

4    Allison, as I think Wijdan mentioned, the attorney

5    representing EyeMart.

6        A.   Okay.

7        Q.   I just wanted to go back to -- you had

8    testified that there was a meeting that you had at

9    the Las Vegas ICSC; is that correct?

10       A.   Yes.

11       Q.   What year was that in?

12       A.   It was in 2002.

13       Q.   Okay.

14       A.   I had just started here.

15       Q.   And who was that meeting with?

16       A.   It was with Marty Sherman, and he brought

17   two people along that were from Crabtree.

18       Q.   Okay.  And how did that meeting get set

19   up; do you know?

20       A.   I believe I initiated the meeting.

21       Q.   Okay.

22       A.   I could not even tell you for sure.  I

23   would hate to even say for sure that I am the one

24   that called him, but that is my guess.

29

1      Q.    Do you know when the meeting was set up?

2      A.    It was the first day of the convention.

3   So it was on Monday.

4      Q.    So you set up the meeting the first day of

5   the convention?

6      A.    No.  I set it up prior to the convention,

7   but the actual meeting date and time was the first

8   day of the convention, which was on May the 20th.

9      Q.    And --

10      A.    At 3:30 p.m.

11      Q.    And you set -- who did you set it up for?

12   I apologize.

13      A.    It was for Crabtree and also -- I have it

14   here.  It is in my notes.  Crabtree and Dr. Barnes'

15   Eye Wear.

16      Q.    Okay.  Did you have in mind what you

17   wanted to discuss at that meeting?

18      A.    Yeah.  At that time I was an account base.

19   I had only two properties that I leased, Charlestown

20   and West Shore.  So that was the plan was to talk

21   about both concepts at both centers.

22      Q.    Okay.  And was it your suggestion that it

23   be set up for EyeMart and Crabtree?

24      A.    Oh, I am sure because I had just did a

30

1    deal with them.  So yeah.

2        Q.    Okay.  And then you had testified earlier

3    that Marty said that the locations that you brought

4    up in that meeting would not be good for EyeMart?

5        A.    Yeah, he just -- you know, it was very

6    brief.  He just -- he passed on them.

7        Q.    Okay.

8        A.    It wasn't -- you know --

9        Q.    So was the majority of the meeting spent

10   discussing Crabtree & Evelyn?

11       A.    The majority of the meeting was spent

12   discussing West Shore, a redevelopment that we were

13   projecting to do, and me trying to get Crabtree to

14   go in that redevelopment.  But it wasn't -- yeah, I

15   would have to say the majority of that probably was

16   it.

17       Q.    Okay.  Do you know when you set up the

18   meeting?

19       A.    I had -- our assistant in the corporate

20   office, she was setting up meetings for me even

21   before I had started.  So -- and I started

22   April 9th, and they were setting up meetings.  I

23   gave them a list of people to contact.  And I

24   have -- let's see if I have that right here.

31

1    Because she may have called him before I started.

2    Because they set up about 10 meetings before I

3    started.  Let's see.

4        Q.    I mean, it sounds like you are looking off

5    of notes to answer some of these questions.

6        A.    Yeah.

7        Q.    I am going to request a copy of those

8    notes.  Can you make a copy of those and send those

9    to me?

10        A.    Yeah.  I will just have to get it okayed

11    by our in-house guy -- in-house attorney.

12        Q.    I would suspect -- okay.

13        A.    All right.  Let's see.

14        Q.    I would like to have a copy of all of the

15    notes that you used during this deposition.

16        A.    Okay.  I will just have to -- Tom Daniels

17    is sort of our in-house legal person.  He will just

18    have to review everything first, and then I could

19    get them shipped out to you.

20        Q.    That is fine.

21        A.    Here it is.  Dr. Barnes' Eye Wear Express,

22    Midwest real estate person, (513) 563-3566.  This is

23    her handwriting.  So yeah, she did call -- she did

24    call him before I actually started, which was prior

32

1   to April 9th.  Because I knew if I waited until I

2   started, there would -- you know, most people -- or

3   a lot of people start doing their Vegas meetings in

4   March.  I have already, actually, started mine.  And

5   waiting until April 9th, there would have been a lot

6   of people I could not meet with.  So I gave her a

7   list.  It is like a three-page list here -- three

8   and a half pages -- of retailers to call for me, and

9   he was one of them.

10      Q.   Okay.  So would you say that, really, the

11  meeting was set up to meet with Martin Sherman and

12  whoever he had to talk about at the time?

13      A.   It was specifically Marty Sherman,

14  Crabtree, and Dr. Barnes.  That is what I have in my

15  notes.  And that is what I have at the top of my

16  notes is the retailers to chat about.

17           With him being a tenant rep, oh, sure,

18  there is always a chance that people are getting new

19  retailers.  But I didn't know that he had any.  But

20  if he did, it is always great to talk about them.

21  But the main point was to talk about Crabtree and

22  EyeMart.

23      Q.   Was it unusual that no EyeMart

24  representatives were at the meeting?

33

1    A.    No.   No, that wasn't.

2         MR. ALLISON:   I think that is all I have.

3         MS. JREISAT:   Thank you very much for your

4    time, Monica.

5

6

7    _____

                        MONICA C. SMITH

8

9              -  -  -

10       (Deposition concluded at 6:18 p.m.)

11             -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

34

1                    C E R T I F I C A T E

2    STATE    OF    OHIO   :
                            :SS
3    COUNTY OF HAMILTON    :

4        I,  Lisa L. Weisenberger, a duly qualified and

5    commissioned notary public in and for the State of

6    Ohio, do hereby certify that prior to the giving of

7    her deposition, the within named MONICA C. SMITH was

8    by me first duly sworn to testify the truth, the

9    whole truth and nothing but the truth; that the

10   foregoing pages constitute a true and correct

11   transcript of testimony given at said time and place

12   by said deponent; that said deposition was taken by

13   me in stenotypy and transcribed under my

14   supervision; that I am neither a relative of nor

15   attorney for any of the parties to this litigation,

16   nor relative of nor employee of any of their

17   counsel, and have no interest whatsoever in the

18   result of this litigation.  I further certify that I

19   am not, nor is the court reporting firm with which I

20   am affiliated, under a contract as defined in Civil

21   Rule 28(D).

22       IN WITNESS WHEREOF, I hereunto set my hand and
     official seal of office, at Cincinnati, Ohio, this
23   2nd day of March, 2004.

24   MY COMMISSION EXPIRES:      LISA L. WEISENBERGER, RPR
     August 30, 2008            NOTARY PUBLIC, STATE OF OHIO

                              MERIT
         602 Main Street, Suite 703, Cinti., OH  45202
         (513) 381-8228 * (800) 578-1542 * www.merit-ls.com

# A F F I D A V I T

- - -

STATE OF OHIO        :
                     :    SS
COUNTY OF HAMILTON   :


I, Lisa L. Weisenberger, Notary Public in and for the

State of Ohio, do hereby state that the transcript of the

deposition of MONICA C. SMITH, deponent herein, having

been submitted to said deponent for review and signature,

has not been signed within the twenty-eight (28) day

period allowed under the Federal Rules; said deposition to

now have the same force and effect as though signed.


*Lisa L. Weisenberger*
Lisa L. Weisenberger, Court Reporter


Sworn to before me this 8ᵗᵈ day of April_____, 2004.


*Thomas M. Blasing*
Thomas M. Blasing
Notary Public - State of Ohio

My commission expires:
May 4, 2009.