UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| M&S ADVISORY GROUP, INC., | : | Case No. C-1-02-522 |
| | : | |
| Plaintiff, | : | Judge Spiegel |
| | : | Magistrate Judge Hogan |
| v. | : | |
| | : | **DEFENDANT EYEMART EXPRESS** |
| EYEMART EXPRESS, LTD., | : | **LTD.'S MEMORANDUM IN** |
| | : | **OPPOSITION TO PLAINTIFF'S** |
| Defendant. | : | **MOTION FOR SUMMARY** |
| | | **JUDGMENT** |

I.  **INTRODUCTION**

On March 15, 2004, Plaintiff M&S Advisory Group, Inc. ("M&S") filed its Motion for Summary Judgment against Defendant EyeMart Express, Ltd. ("EyeMart") claiming M&S was entitled to summary judgment on its breach of contract claim and on EyeMart's counterclaims of breach of contract and promissory estoppel. In its Memorandum in Support ("M&S's Memorandum"), M&S asserts that EyeMart breached the Agreement by failing to provide notice of M&S's breaches and thirty days to cure prior to terminating the Agreement due to M&S's breaches. M&S is not entitled to summary judgment on this claim because there is at least a question of material fact as to whether EyeMart provided notice and an opportunity to cure under the Agreement. Moreover, there is at least a question of fact as to whether the Agreement required notice and an opportunity to cure M&S's breaches prior to the termination of the Agreement.

With regard to EyeMart's counterclaims of breach of contract and promissory estoppel, EyeMart has filed a Motion for Summary Judgment and a Memorandum in Support ("EyeMart's

Memorandum") asserting that it is entitled to judgment as a matter of law on these claims.[1] At best, M&S can argue there is a question of material fact as to whether M&S failed to perform as contemplated by the terms of the Agreement, as to whether M&S made certain promises to EyeMart, and as to whether it failed to fulfill such promises. For these reasons, Plaintiff M&S Advisory Group, Inc.'s Motion for Summary Judgment should be denied in its entirety.

## II.    ARGUMENT

### A.    M&S Is Not Entitled To Summary Judgment On Its Breach of Contract Claim.

M&S is not entitled to summary judgment on its breach of contract claim because EyeMart provided written notice and an opportunity to cure as contemplated by the Agreement prior to terminating the Agreement due to M&S's breaches. Moreover, the Agreement did not, under the circumstances of this case, require EyeMart to provide notice and an opportunity to cure prior to termination. Courts have consistently held that where, as here, a breach is incurable, notice and an opportunity to cure need not be given as it would constitute a futile gesture. At best, M&S can argue the Agreement is ambiguous as to what actions were required prior to its termination. If the Agreement is considered ambiguous in this regard, a question of material fact is created as to whether notice and opportunity to cure was required by the Agreement and as to whether EyeMart provided such notice and an opportunity to cure.

#### 1.    EyeMart Provided Notice And An Opportunity To Cure Prior To Terminating The Agreement Due To M&S's Breaches.

Paragraph 7b of the Agreement provides:

> This Agreement may be terminated by either party for "Cause" which shall be defined as the breach of any material provision of this Agreement by the other party, which breach is not cured within thirty (30) days after written notice thereof is delivered to such other party, or Consultant's failure by reason of his health to

---

[1]    EyeMart hereby incorporates by reference its Memorandum in Support.

> make Martin Sherman available on a continuing and active basis as principle to provide the services set forth hereunder.

(Pl. Exh. 1).[2] M&S claims, in its Memorandum, that EyeMart terminated the Agreement without providing notice and an opportunity for M&S to cure its breaches under the Agreement. (M&S's Memorandum 1, 4, 6, 8; Sherman Affidavit ¶ 11). This assertion is untrue. Rather, as set forth in EyeMart's Memorandum at 8-11, one month after the execution of the Agreement, after Sherman (M&S's sole owner and lone consultant) had repeatedly failed to perform under the Agreement, Dr. Barnes instructed Herskovitz to begin sending Sherman written notices of his nonperformance and of what EyeMart wanted accomplished in case the Agreement had to be terminated due to Sherman's breaches. (Barnes Depo. 81-89; Herskovitz Depo. 69, 73, 75, 79-80, 88-89; Grubb Depo. 81-83).

From February to May of 2002, Herskovitz sent Sherman four written notices. (Barnes Depo. 45-46, 121-128; Herskovitz Depo. 75, 90, 105-109). On February 28, 2002, Herskovitz sent Sherman a notice personally signed by Dr. Barnes listing the locations EyeMart expected Sherman to pursue on its behalf. (Df. Exh. 6; Herskovitz Depo. 75, 90; Sherman Depo. 131). The list included the Park City Mall in Lancaster, Pennsylvania, the York Galleria in York, Pennsylvania, the Paxton Towne Centre in Harrisburg, Pennsylvania, the Barton Creek Mall in Austin, Texas, the North Star Mall in San Antonio, Texas, and a location in Champaign, Illinois among others. (Df. Exh. 6). The highest priority locations were in Harrisburg, York and Lancaster. (Df. Exh. 2; Barnes Depo. 56, 59, 61; Herskovitz Depo. 47, 58-59; Grubb Depo. 13). On March 21, March 26 and April 16, 2002, Herskovitz sent Sherman notices regarding the same locations. (Df. Exhs. 9, 10 and 12; Herskovitz Depo. 105-109; Sherman Depo. 142, 147-148,

---

[2] Pl. Exh. refers to the Exhibits Plaintiff introduced during the depositions of Dr. Barnes, Herskovitz and Grubb whereas Df. Exh. refers to the Exhibits Defendant introduced during the deposition of Plaintiff. All Exhibits and Deposition Transcripts of EyeMart personnel are filed under seal pursuant to the Protective Order in this case.

153-154). Sherman admitted in his deposition that he received the notices. (Sherman Depo. 131, 142, 147-148, 153, 154).

In addition to and in connection with these written notices, Herskovitz was on the telephone with Sherman several times a week to discuss Sherman's failure to make progress with regard to the locations EyeMart wished to pursue. (Herskovitz Depo. 83-84, 94-95, 109). In fact, during a telephone conversation with EyeMart representatives on May 13, 2002, Sherman admitted that he had received the written notices, that he was failing to perform under the Agreement and that he was aware EyeMart was not satisfied with his performance. (Pl. Exh. 18 at 6, 8, 10-16, 18, 20-21, 24-25, 30-32, 37; Herskovitz Affidavit ¶ 3, attached hereto as Exh. A). During the conversation, Sherman admitted "you're not happy with Marty Sherman, I really am sorry. . . I'm not satisfying you, and that troubles me . . . I'm sorry if I've let you down. Okay." (Pl. Exh. 18 at 10, 13, 20, 37).

However, as set forth in EyeMart's Memorandum at 11-13, despite the efforts of Herskovitz, during this entire time Sherman did not make progress on the locations EyeMart had designated as priorities from the beginning. (Barnes Depo. 73-74; Herskovitz Depo. 102-105). For example, Sherman never made an attempt (not even a telephone call) to pursue the Paxton Towne Centre in Harrisburg, Pennsylvania, from February through April, even though it had been designated a priority location in early February and even though he received four written notices regarding this location, on February 28, March 21, March 26 and April 16. (Df. Exhs. 6, 9, 10 and 12; Aristone Depo. 6-7; Barnes Depo. 73-74, 84; Herskovitz Depo. 69-70, 83; Grubb Depo. 86; Sherman Depo. 110). In addition to his breach regarding the Paxton Towne Centre, Sherman, during the same months, also did not attempt (again not even a telephone call) to pursue the York Galleria, another priority location for which Sherman received the same written

4

notices. (Df. Exhs. 6, 9, 10 and 12; Johnson Depo. 5-6, 9, 24-25; Barnes Depo. 73-74; Herskovitz Depo. 71; Grubb Depo. 27-28, 85-86; Sherman Depo. 115-116).

In a case strikingly similar to the instant case, Violante v. Quadland Corp., 1997 Ohio App. LEXIS 3672 (August 15, 1997, 11th Dist.) (attached hereto as Exh. B), plaintiff and defendants entered into a contract under which plaintiff was to provide pay telephone and long distance service to defendants at several locations. See id. at *3. Under the agreement:

> If either party fails to comply with the articles spelled out in this agreement, it will constitute a breach of this agreement relieving the other party of any further obligations under this agreement. However, the party committing the breach will be given a thirty (30) day period to rectify the complaint before this agreement becomes null and void.

Id. at *4. Almost immediately after the installation of the telephone equipment, defendants began receiving complaints about the service provided. Defendants claimed that they repeatedly notified the plaintiff of the various problems with the telephones and telephone service. Plaintiff, however, failed to rectify the problems to defendants' satisfaction. Consequently, defendants sent a letter to plaintiff terminating the contract. See id. at *4-*5.

Plaintiff brought suit alleging breach of contract and claiming that defendants did not provide proper notification and a thirty day opportunity to rectify any alleged breaches of their agreement. Defendants asserted counterclaims of breach of contract and fraud. Both sides filed motions for summary judgment which were denied. At trial, the trial court ruled in favor of defendant on plaintiff's claims and plaintiff on defendants' counterclaims. See id. at *6-*7. Plaintiff appealed.

In affirming the lower court's determination, the Court of Appeals for the Eleventh District found that the agreement in question did not require the non-breaching party to give notice of an intent to cancel the agreement, but merely notice that there were problems with

5

plaintiff's performance.  See id. at *16.  The court found that the evidence demonstrated that defendants had repeatedly notified plaintiff of the problems with the telephone systems and that defendants gave plaintiff ample opportunity to correct the problems before announcing their intent to terminate the relationship.  See id. at *18-*19, *21.  The court found that defendants were well within their rights to cancel the agreement without further notice or additional time to cure.  See id. at *21.

As set forth above and in EyeMart's Memorandum, in the instant action, EyeMart notified Sherman in writing on numerous occasions over multiple months of the problems with his performance.  Sherman was well aware of his failure to perform and of EyeMart's dissatisfaction, and EyeMart gave Sherman ample opportunity to cure the performance problems.  The Agreement does not state that EyeMart had to notify Sherman of its intent to terminate the Agreement if Sherman did not correct his performance problems.  Sherman had more than thirty days to cure his breaches of the Agreement, but failed to take action to perform on behalf of EyeMart as he agreed to do.  (Barnes Depo. 73-74; Herskovitz Depo. 102-105; Grubb Depo. 73). Therefore, EyeMart was legally entitled to terminate the Agreement when it did.

Even if EyeMart had not provided notice and an opportunity to cure consistent with the terms of the Agreement, courts have consistently found that failing to follow written notice provisions in contracts can be construed as harmless where, as here, there is evidence of constructive or actual notice.  See Daniel E. Terreri & Sons, Inc. v. Board of Mahoning County Commissioners, 786 N.E.2d 921, 932 (Ohio App. 2003); Roger J. Au & Son, Inc. v. Northeast Ohio Regional Sewer District, 504 N.E.2d 1209, 1216 (Ohio App. 1986).  In addition, to any extent M&S complains that the manner of delivery (via facsimile) of the written notice was insufficient, courts have consistently held that the purpose of requiring notice is not to be hyper

technical and that deficiencies in the delivery of notice will be disregarded where the party receiving notice can not demonstrate prejudice by the fact that notice was delivered in a manner other than as provided in the contract. See Heider v. Glasstech, Inc., 1999 Ohio App. LEXIS 3331 at *7-9 (July 16, 1999, 6th Dist.) (attached hereto as Exh. C); McGowan v. DM Group IX, 455 N.E.2d 1052 (Ohio App. 1982). In the instant action, it is evident that Sherman was aware of EyeMart's dissatisfaction with his performance and that EyeMart had provided him with written notice of his breaches.

**2. Paragraph 7b Of The Agreement Does Not Provide The Only Method For Terminating The Agreement.**

M&S claims, in its Memorandum, that the Agreement could "only" be terminated for Cause, which was defined as "the breach of any material provision of this Agreement by the other party, which breach is not cured with thirty (30) days after written notice." (M&S's Memorandum 3, 9). Although EyeMart terminated the Agreement after providing written notice of M&S's breaches and an opportunity to cure, it was not required to do so. (Pl. Exh. 1). Despite M&S's contentions, the Agreement simply does not state that the Agreement can "only" be terminated for Cause. Rather, it states that the Agreement "may" be terminated for Cause. (Pl. Exh. 1)

In Leghorn v. Wieland, 289 So.2d 745, 746 (Fla. App. 1974), Wieland was employed under an employment agreement with Leghorn. The Agreement between the parties provided:

> If any party to this agreement defaults in the performance of any provision to be performed by it or him any other party *may* give the defaulting party written notice to correct the default. . . . In the event Employee defaults in the performance of this agreement, upon failure to correct same within sixty (60) days written notice from the Owner and Companies, this agreement shall be immediately terminated.

7

Id. Without giving prior notice, Leghorn asked Wieland to resign. Wieland filed suit claiming breach of contract. See id.

The Leghorn court held that "when given its ordinary meaning, the word 'may' denotes a permissive term rather than the mandatory connotation of the word 'shall.'" Id. at 747. (internal citations omitted). The court found that "[b]y the use of the word 'may' the parties did not intend to make the giving of notice the 'legal duty' of either party." Id.; see also Traveny v. University of Akron, 1999 Ohio App. LEXIS 6528 (August 12, 1999, 10th Dist.) (attached hereto as Exh. D) (holding that the plain meaning of "may" clearly denotes discretion or permission and that, had a mandatory meaning been intended, the words "shall" or "will" would have been used).

In the instant action, the parties opted to make the giving of notice and an opportunity to cure discretionary under certain circumstances by using the word "may" in paragraph 7b of the Agreement. (Pl. Exh. 1). Had the parties intended this to be the only method for terminating the Agreement, the parties would have chosen other words, perhaps the phrase "may only" or "except as otherwise provided in this Agreement, may only." Even when read in conjunction with paragraph 7a, the same conclusion must be reached. By the use of the word "may" EyeMart and M&S clearly did not intend to make the giving of notice a legal duty of either party under every circumstance and M&S, therefore, cannot claim breach of contract on the basis of the alleged failure of EyeMart to give such notice.

### 3. EyeMart Was Not Required To Provide Notice And An Opportunity To Cure Because M&S's Final Breach Was Incurable.

The Agreement allows for termination under circumstances where a parties' breach is incurable and/or irreparable. In Leghorn, Weiland (the employee who was terminated) had allegedly misappropriated corporate funds to his own use, attempted to usurp for his own profit business opportunities, and had in several other aspects failed to perform his obligations under

8

the employment agreement. See Leghorn, 289 So.2d at 747. The court found that this was exactly the kind of circumstance which would not require notice and an opportunity to cure. See id. at 747-748. The court found that, if either party considered a breach to be so grave as to be irreparable and incurable, the giving of notice in such circumstances would be a useless gesture. See id.; see also Dwyer v. Unit Power, Inc., 965 S.W.2d 301, 308 (Mo. App. 1998); Larkin, Inc. v. Larkin Iowa City Limited Partnership, 589 N.W.2d 700, 704-705 (Iowa 1998) (holding that acts of self dealing were so serious that they frustrated one of the principal purposes of the agreement which was to act in the best interests of the other party and to be honest and forthright, and that no amount of payment for past thefts could ever restore trust and confidence to the relationship). The futility of giving notice is an issue of fact. See Alliance Metals, Inc., of Atlanta v. Hinely Industries, Inc., 222 F.3d 895, 905 (11th Cir. 2000).

In the instant case, although Sherman was guilty of multiple breaches during the term of the Agreement, which he failed to cure despite being given multiple written notices and ample opportunity, his final breach was incurable. From the beginning of the relationship between M&S and EyeMart, Sherman told EyeMart that its representatives, and specifically Dr. Barnes, should attend the ICSC convention in Las Vegas in May of 2002 so that they could meet face-to-face with and begin to establish relationships with major players in the real estate development industry. (Barnes Depo. 70, 93-95, 156; Herskovitz Depo. 174, 178; Krall Depo. 26-27, 38). A few weeks after the execution of the Agreement, Sherman flew to Dallas, Texas, which is where EyeMart's corporate headquarters is located, to meet with EyeMart representatives to discuss and further develop EyeMart's strategic plan. (Barnes Depo. 47-49, 57; Herskovitz Depo. 38-39; Grubb Depo. 11-12; Krall Depo. 20-24; Sherman Depo. 93-94). The meeting lasted three days, from February 18 to February 20, 2002. (Barnes Depo. 47-48, 57; Herskovitz Depo. 38-39;

Grubb Depo. 11-12). During the strategy meeting, Sherman, as part of the strategic plan, told EyeMart representatives again (as he did throughout the relationship) that it was important that they come to the ICSC in Las Vegas in May of 2002 and Sherman would arrange for meetings between EyeMart and many of the major players in the real estate development industry. (Barnes Depo. 70; Herskovitz Depo. 174; Krall Depo. 26-27, 38). Sherman thought it was important that not only he attend the convention on behalf of EyeMart, but that his clients attend in person as well. In fact, Sherman's common practice with his other client, Crabtree & Evelyn, was to have Crabtree & Evelyn representatives present for any meetings he attended on their behalf at the convention. (Kelleher Depo. 35-37, 44, 48, 53-55; Rice Depo. 17-19, 21, 24).

When EyeMart arrived at the convention, Sherman told EyeMart that he had not arranged for any meetings between EyeMart and anyone in the real estate development industry. (Barnes Depo. 103-110; Krall Depo. 33-44; Sherman Depo. 202). This was an incurable breach by M&S. As the convention was held on an annual basis, there was no way for EyeMart representatives to have the same opportunity to meet face-to-face with major players in the real estate development industry as part of the strategic plan. As Crabtree & Evelyn representative Kelleher testified in his deposition, the ICSC convention in Las Vegas is the largest convention of its kind and it is the best opportunity for companies to meet with the greatest number of real estate developers at one time and to establish relationships with those developers. (Kelleher Depo. 24, 29).

Due to Sherman's failure to arrange for any meetings for EyeMart, EyeMart lost this opportunity. EyeMart representatives attempted to use their time at the convention productively and met with some developers. However, since most developers had scheduled meetings, EyeMart was only able to meet with developers as availability allowed. (Barnes Depo. 114-117;

Herskovitz Depo. 178; Grubb Depo. 62-64). EyeMart attended the convention hoping that Sherman could resurrect himself after having failed to perform under the terms of the Agreement up to that point in the relationship. (Barnes Depo. 101; Herskovitz Depo. 173-174). M&S's incurable breach at the convention only served to completely destroy any remaining trust and confidence EyeMart had at that point in its relationship with M&S. (Herskovitz Depo. 95, 132-136; Grubb Depo. 45-48; Sherman Depo. 161-163). Under these circumstances, providing notice and an opportunity to cure would have been a futile gesture by EyeMart. Thus, despite the fact that EyeMart had given written notice and ample opportunity to cure various breaches by M&S during the course of the Agreement, in reality, M&S's final breach of the Agreement justified its immediate termination.

### 4. At Best, Plaintiff Can Argue Paragraph 7b Of The Agreement Is Ambiguous.

As stated above, EyeMart provided written notice and an opportunity to cure consistent with paragraph 7b of the Agreement. While the Agreement does state that notice must be in writing, it does not state what words must be contained in the notice. (Pl. Exh. 1). For example, it does not state that the notice must warn of termination nor does it state that the notice must specifically provide that the breaching party will have thirty days to cure the breach. Thus, EyeMart's written notices complied with paragraph 7b. See Violante, 1997 Ohio App. LEXIS 3672 at *18-*21. Moreover, EyeMart was not required to provide any notice at all given the discretionary word "may" in paragraph 7b of the Agreement and given the incurable nature of M&S's final breach of the Agreement. Despite this, Plaintiff claims that EyeMart breached the Agreement by allegedly failing to provide notice and an opportunity to cure consistent with paragraph 7b of the Agreement.

11

However, at best, M&S can argue paragraph 7b is ambiguous thereby creating an issue of material fact as to whether EyeMart was required to provide notice and an opportunity to cure and as to whether the notices EyeMart did provide were consistent with paragraph 7b of the Agreement. Contractual language is ambiguous if it is subject to two reasonable interpretations. See Wulf v. Quantum Chemical Corp., 26 F.3d 1368, 1376 (6th. Cir. 1994); Smith v. ABS Industries, 890 F.2d 841, 846-847 n.1 (6th Cir. 1989). Where ambiguity exists, the meaning of contract language is a question of fact. See Books-A-Million, Inc. v. H & N Enterprises, Inc., 140 F.Supp.2d 846, 854 (S.D. Ohio 2001); Amstutz v. Prudential Ins. Co. of America, 26 N.E.2d 454 (Ohio 1940). EyeMart has offered a reasonable interpretation of paragraph 7b of the Agreement. M&S has offered its interpretation. Thus, at best, M&S can argue an issue of material fact is created as to the meaning of paragraph 7b of the Agreement and summary judgment for M&S is not appropriate.

M&S is not entitled to summary judgment on its breach of contract claim because EyeMart provided written notice and an opportunity to cure consistent with paragraph 7b of the Agreement. Moreover, EyeMart was not required to provide notice and an opportunity to cure and, at best, paragraph 7b of the Agreement is ambiguous thereby creating an issue of material fact as to whether EyeMart was required to provide notice and an opportunity to cure and as to whether the notices EyeMart did provide were consistent with the terms of paragraph 7b of the Agreement.[3]

---

[3] M&S sets forth the amount of damages it claims it is entitled to in its Memorandum at 9-10. In reality, M&S is not entitled to any damages because EyeMart did not breach the Agreement. In addition, EyeMart disputes M&S's calculation of damages. In the event M&S is awarded damages in this case, EyeMart requests a trial on the issue of damages.

**B.     M&S Is Not Entitled To Summary Judgment On EyeMart's Counterclaim Of Breach Of Contract.**

**1.     M&S Breached The Agreement.**

M&S, in its Memorandum, claims there is no dispute that it was providing consulting services as required under the Agreement. (M&S's Memorandum 8; Sherman Affidavit ¶¶ 6-8). Nothing could be further from the truth. M&S claims that it "began developing appropriate locations to respond to EyeMart's plan of opening approximately fifteen new stores each year and renewing leases for existing locations." (M&S's Memorandum 3; Sherman Affidavit ¶¶ 6-7). M&S further claims that it "developed various opportunities to locate stores in the predetermined strategic markets." (M&S's Memorandum 3). It is unclear what M&S means by "appropriate" locations. However, it is clear that, with regard to locations that had been identified as priority locations from the beginning of the Agreement as part of the strategic plan, including locations in Harrisburg, York and Lancaster, Pennsylvania, Sherman did not take any action for multiple months. (Barnes Depo. 73-74; Herskovitz Depo. 104; Grubb Depo. 73). Sherman testified in his deposition that EyeMart's priorities were his priorities. (Sherman Depo. 33). However, his actions did not reflect this sentiment.

M&S claims, in its Memorandum, that "market opportunities targeted and developed by M&S's efforts were accepted by EyeMart and proceeded to the conclusion of lease agreements for the store locations." (M&S's Memorandum 3). In reality, M&S did not target any store locations for EyeMart. Rather, EyeMart informed Sherman in writing of the locations it wished to pursue during the first month of the Agreement. (Df. Exhs. 1, 2, 6; Barnes Depo. 81-91; Herskovitz Depo. 64-67, 75, 90; Grubb Depo. 13-15, 26; Sherman Depo. 110, 115-116, 119-120, 131). From February to May of 2002, Herskovitz sent Sherman four written notices regarding these locations. (Df. Exhs. 6, 9, 10 and 12; Barnes Depo. 45-46, 121-128; Herskovitz Depo. 75,

13

90, 105-109; Sherman Depo. 142, 147-148, 153-154). With regard to the highest priority locations, Sherman failed to take any action (not even a phone call) to pursue them. (Barnes Depo. 73-74; Herskovitz Depo. 104; Grubb Depo. 73). Despite M&S's contentions to the contrary, during the four-month period in which the agreement was in effect, Sherman failed to negotiate a single lease or open even one store location on behalf of EyeMart. (Barnes Depo. 76, 131; Herskovitz Depo. 188). With regard to the twelve locations M&S, in its Memorandum, claims it worked on, there is no evidence that M&S did more than make a phone call with regard to most of these locations. (Barnes Depo. 139-152). Sherman did not produce in discovery notes/lists/worksheets he claimed he had in his deposition that allegedly would demonstrate the work he claimed he was doing. Moreover, it is clear that, with regard to the highest priority locations, Sherman failed to take any action at all to pursue these locations despite being repeatedly notified in writing of EyeMart's desire that he do so. (Barnes Depo. 73-74; Herskovitz Depo. 104; Grubb Depo. 73).

  M&S also claims, in its Memorandum, that Sherman set meetings with a total of three persons at the May 2002 ICSC convention in Las Vegas to discuss possible locations for EyeMart. (M&S's Memorandum 4; Sherman Affidavit ¶ 9). Sherman, however, did not arrange for any meetings for EyeMart with anyone. (Barnes Depo. 103-110; Krall Depo. 43-44; Sherman Depo. 202). Sherman instead filled his three-day convention schedule with half-hour meetings for his other client, Crabtree & Evelyn. (Barnes Depo. 103-110; Krall Depo. 33-34; Sherman Depo. 202). The Crabtree & Evelyn representatives who were present at the convention confirmed, in their respective depositions, that they were scheduled to spend the entire convention in meetings with Sherman. (Kelleher Depo. 35-37, 44, 48, 53-55; Rice Depo. 17-19, 21, 24). In fact, they did not even know that EyeMart would be attending the convention.

(Kelleher Depo. 48; Rice Depo. 41). In addition, Monica Smith (one of the three persons who allegedly was to meet with EyeMart) testified in her deposition that, she arranged for the meeting she had with Sherman, the meeting was primarily to discuss Crabtree & Evelyn business, and Crabtree & Evelyn representatives attended the meeting while EyeMart representatives did not. (Smith Depo. 28-30).

Additionally, M&S disingenuously suggests, in its Memorandum, that EyeMart terminated the Agreement because it "wanted the advantage of the valuable information that M&S could provide without fully compensating M&S for that information." (M&S's Memorandum 6; Sherman Affidavit ¶ 12). This assertion is preposterous. EyeMart paid Sherman over forty thousand dollars during the four-month period in which the Agreement was in effect and got absolutely no return on its investment. (Barnes Depo. 76, 131; Herskovitz Depo. 188). Moreover, EyeMart representatives had years of experience selecting locations, making contact with real estate developers, and negotiating leases. (Barnes Depo. 145-148; Herskovitz Depo. 8-10, 55; Grubb Depo. 36, 77; Krall Depo. 22). To be sure, when EyeMart entered into the Agreement with M&S, EyeMart believed Sherman could provide valuable service to EyeMart. However, EyeMart discovered otherwise.[4]

Due to Sherman's failure to perform under the Agreement, EyeMart filed a Motion for Summary Judgment asserting breach of contract as well as promissory estoppel. In EyeMart's Memorandum at 18-20, EyeMart demonstrated that, under the Agreement, M&S was to act as EyeMart's exclusive leasing agent for all locations and it was to make Sherman available at

---

[4] M&S further claims, in its Memorandum, that EyeMart's counsel has admitted EyeMart did not have the right to terminate the Agreement based on any breaches by Sherman because EyeMart's counsel suggested that the Agreement was terminated due to Sherman's health. (M&S's Memorandum 6). As an initial matter, the alleged statements attributed to EyeMart's counsel are inadmissible hearsay. See Treff v. Galetka, 74 F. 3d 191, 195 (10th Cir. 1995); Cormier v. Pennsoil, 969 F. 2d 1559, 1561 (5th Cir. 1992). In any event, M&S's assertion does not make any sense. EyeMart does not know why Sherman failed to perform under the Agreement. Speculation as to the reasons for Sherman's failure to perform does not in any way suggest that EyeMart terminated the Agreement for any reason other than Sherman's breaches.

mutually agreeable times and locations as requested to implement EyeMart's strategic plan by selecting retail store locations and by negotiating leases for those locations. Sherman was well aware of EyeMart's strategic plan. (EyeMart's Memorandum 19). In fact, in M&S's Memorandum, M&S concedes that EyeMart's strategic plan was to "open approximately fifteen new stores each year . . . in the predetermined strategic markets." (M&S's Memorandum 3; Sherman Affidavit ¶¶ 6-7). Moreover, Sherman testified in his deposition that EyeMart's priorities were his priorities. (Sherman Depo 33). However, as set forth in EyeMart's Memorandum at 18-20, Sherman failed to implement EyeMart's strategic plan by failing to provide information as requested, by failing to pursue locations, including locations EyeMart had designated as priority locations, and by failing to arrange for meetings at the ICSC between EyeMart representatives and major players in the real estate development industry.[5]

### 2.    At Best, M&S Can Argue The Agreement Is Ambiguous.

EyeMart asserts that, under the Agreement, it was clear that M&S was to implement EyeMart's strategic plan and that M&S breached the Agreement by failing to do so. M&S claims, however, in its Memorandum, that EyeMart cannot seek to impose any specific duties it complains of because such duties were not specifically imposed by the Agreement. (M&S's Memorandum 11, 12). In other words, M&S claims that EyeMart cannot assert a breach of contract claim on the basis of Sherman's failure to pursue designated priority locations on behalf of EyeMart or on the basis of Sherman's failure to arrange for any meetings for EyeMart with anyone at the ICSC convention. Of course, following M&S's argument to its logical conclusion,

---

[5] M&S claims, in its Memorandum, that EyeMart cannot recover damages on its breach of contract claim because it did not exercise its right to provide notice and an opportunity to cure before terminating the Agreement. (M&S's Memorandum 11). As demonstrated above and in EyeMart's Memorandum, if, in fact, notice and an opportunity to cure was required in this case, EyeMart did provide such notice and ample time to cure prior to terminating the Agreement. Therefore, EyeMart is entitled to recover damages on its breach of contract claim.

M&S claims it was not required to take any action under the Agreement. This is an unreasonable interpretation of the Agreement.

However, at best, M&S can argue the Agreement is ambiguous as to what was required of M&S and Sherman. Contractual language is ambiguous if it is subject to two reasonable interpretations. See Wulf, 26 F.3d at 1376; Smith, 890 F.2d at 846-847 n.1. Where ambiguity exists, the meaning of contract language is a question of fact. See Books-A-Million, Inc., 140 F.Supp.2d at 854; Amstutz, 26 N.E.2d at 454. Where a provision in a contract is ambiguous a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence. See Wulf, 26 F.3d at 1376; Boyer v. Douglas Components, 986 F.2d 999, 1005 (6th Cir. 1993); In re White Farm Equipment Co., 788 F.2d 1186, 1193 (6th Cir. 1986). When interpreting a contract, courts look not only at the language, but also for additional evidence that reflects the intent of the contracting parties. See Wulf, 26 F.3d at 1376. This is true regardless of whether a contract is fully integrated. See Books-A-Million Inc., 140 F.Supp.2d at 857. Preliminary negotiations may be considered for the purpose of explaining ambiguous language in a written contract. See Pharmacia Hepar, Inc. v. City of Franklin, 676 N.E.2d 587, 592 (Ohio App. 1996); New York Cent. R. Co. v. General Motors Corp., 182 F.Supp. 273 (N.D. Ohio 1960).

The Sixth Circuit has held, "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." United Mine Workers of America, International Union v. Cyprus Mountain Coals Corp., 2002 U.S. App. LEXIS 24549 at *8 (December 2, 2002, 6th Cir.) (holding that a district court must allow evidence or argument regarding the intended meaning of the parties' agreement) (attached

hereto as Exh. E); International Union, United Auto Workers v. Yard-Man, Inc., 716 F.2d 1467, 1479-1480 (6th Cir. 1983).

The Seventh Circuit has held, "the language of a contract cannot be properly understood if it is read without attention to the circumstances under which it was written . . .  In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed . . . Contacts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish." Florida East Coast Railway Company v. CSX Transportation, Inc., 42 F.3d 1125, 1129 (7th Cir. 1994).

EyeMart has offered a reasonable interpretation as to what the Agreement required of M&S.  M&S has also offered its interpretation, which is that the Agreement required Sherman to do nothing, or whatever he wanted to do and whenever he wanted to do it.  This interpretation of the Agreement is unreasonable and would render the Agreement largely illusory.  "Although parties are free to enter into illusory agreements, the unlikelihood that they will do so when significant [monies] are at stake may render a term ambiguous." In re New Valley Corporation, 89 F.3d 143, 151 (3rd Cir. 1996).  As such, at best, M&S can argue the Agreement is ambiguous and a question of material fact is presented as to what the Agreement required of M&S and Sherman.  Whether or not the Agreement is Ambiguous, pursuant to United Mine Workers of America and Yardman, this Court should allow extrinsic evidence, including the preliminary negotiations between M&S and EyeMart prior to entering into the Agreement, to assess the

intent of the parties. See United Mine Workers of America, 2002 U.S. App. LEXIS 24549 at *8: Yard-Man, Inc., 716 F.2d at 1479-1480.

### C. M&S Is Not Entitled To Summary Judgment On EyeMart's Promissory Estoppel Claim.

M&S claims, in its Memorandum, that EyeMart cannot assert a claim for promissory estoppel if it has asserted a breach of contract claim. (M&S's Memorandum 13-15). However, courts have consistently held that a party may plead and present both breach of contract and promissory estoppel theories to the trier of fact and that, to completely bar one theory at the summary judgment phase is inappropriate. See Schleicher v. Alliance Corporate Resources, Inc., 1995 Ohio App. LEXIS 5405 at *14 (December 7, 1995, 10th Dist.) (attached hereto as Exh. F); Stroble v. Sir Speedy Printing Center, 589 N.E.2d 449 (Ohio App. 1990); Pond v. Devon Hotels, Ltd., 563 N.E.2d 738 (Ohio App. 1988).

EyeMart, in its Memorandum at 17-18, has demonstrated that it is entitled to summary judgment on its promissory estoppel claim. EyeMart is, at the very least, permitted to plead its promissory estoppel claim at this stage of the litigation. Moreover, M&S, in its Memorandum, does not even attempt to assert that Sherman did not make promises to EyeMart or that EyeMart did not justifiably rely to its detriment on these promises. Thus, M&S is not entitled to summary judgment on EyeMart's claim of promissory estoppel.

### III. CONCLUSION

For all of the foregoing reasons, M&S Advisory Group, Inc.'s Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,

/s/ Michael W. Hawkins
Michael W. Hawkins (0012707)
Jon B. Allison (0073955)
DINSMORE & SHOHL, LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio  45202
513/977-8200 (Phone)
513/977-8141 (Fax)

Trial Attorneys for Defendant,
EyeMart Express, Ltd.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert A. Pitcairn, Jr., Esq.
Wijdan Jreisat, Esq.
Katz, Teller, Brant & Hild
255 East Fifth Street
Suite 2400
Cincinnati, Ohio 45202-4787

/s/ Michael W. Hawkins
Michael W. Hawkins (0012707)