UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **M&S ADVISORY GROUP, INC.** | : | Case No. C-1-02-522 |
| Plaintiff, | : | **PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | : | |
| **EYEMART EXPRESS, LTD.,** | : | |
| | | **Judge Spiegel** |
| Defendant. | : | **Magistrate Judge Hogan** |

## I.   INTRODUCTION

Both parties to this action have now filed motions for summary judgment on their claims.  As this Court is aware, it "must evaluate each party's motion on its own merits, taking care in such instance to draw all reasonable inferences against the party whose motion is under consideration."  Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991); Westfield Ins. Co. v. Tech Dry, Inc., 336 F.3d 503, 506 (6th Cir. 2003).   In response to Plaintiff M&S Advisory Group, Inc.'s ("M&S") motion for summary judgment, Defendant EyeMart Express, Ltd. ("EyeMart") acknowledges that M&S can assert questions of material fact as to the counterclaims asserted by EyeMart and thus defeat the motion for summary judgment filed by EyeMart.  Defendant EyeMart Express Ltd.'s Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("EyeMart Memorandum"), p. 2.  M&S has demonstrated that it is entitled to summary judgment in its favor on its claim in the Complaint and against the counterclaims of EyeMart.

1

## II.  M&S IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM

As set forth in detail in M&S's motion for summary judgment, the Agreement in question was terminable for cause provided that the objecting party gave notice and an opportunity to cure.  This, EyeMart failed to do.  Therefore, when EyeMart terminated the Agreement, it did so in breach of the Agreement.  In its memorandum, EyeMart posits four arguments in an attempt to confuse this clear breach:  (A) it provided the notice required;  (B) the Agreement did not require such notice;  (C) the alleged breach was incurable; or (D) the Agreement is ambiguous.  None of these arguments is supported by the facts or the law.

### A.  The Notice Alleged was Insufficient

According to EyeMart, four memoranda submitted by EyeMart to Mr. Sherman, Defendant's Exhibits 6, 9, 10 and 12, constituted the notice of default required by the Agreement.  EyeMart Memorandum, p. 3.  A review of these memoranda makes clear they were not notices of default but mere status updates.   Exhibit 6, which EyeMart notes was specifically signed by EyeMart's principal, Doug Barnes, is a memorandum from Jonathan Herskovitz, EyeMart's primary contact with M&S, to Mr. Sherman, M&S's principal.  The reference line for that memorandum is "Doug Barnes Wish List."  As that title indicates, the memo then states "Here's our wish list" and sets forth various locations.  How this listing of desired locations was to notify of any alleged defaults is inconceivable - - it was a communication of the client's desires to its consultant.

Likewise, Exhibit 9 is a memorandum from Mr. Herskovitz to Mr. Sherman which reads "Here is my status update" and proceeds to list the status of various locations.  Some locations read "waiting on Marty to . . .".  The references are not restricted to

matters for M&S to accomplish, however.  The memorandum includes notes such as "need to determine where in city we need to go", "lease being reviewed by attorney", etc. – presumably matters to be handled by persons other than M&S.  Rather than an approbation of M&S's performance, the memorandum is a status update which ends with a peppy "Hope you are having a great day.  Talk to you soon."

Exhibit 10 is another memorandum from Mr. Herskovitz addressed to not only Mr. Sherman but to Doug Barnes and Rick Grubb of EyeMart.  This memorandum states "Attached is the new and improved Future Location Status Report.  I will update you regularly.  Please let me know if you have any revisions or updates.  Make it a profitable day  . . . "  A review of the status notes indicates that Mr. Sherman is in the process of working on several matters while other matters await action by Mr. Herskovitz or Dr. Barnes. Exhibit 12 is an updated version of Exhibit 10 again addressed to Mr. Sherman, Mr. Grubb and Dr. Barnes.

It is difficult to believe EyeMart asserts that these memoranda were default notices as required by the Agreement.   They were simple progress reports to keep the various parties involved up to date on the happenings in various locations.  Certainly, EyeMart was no stranger to such notice and default provisions.  Deposition of Jonathan Herskovitz filed separately and incorporated herein by reference ("Herskovitz Deposition"), pp. 28-30.  EyeMart also clearly understood the importance of such notification provisions in contracts:

> Q. Is that very important to do?
> A. Very.
> Q. Why?
> A. Because there's a representation – a promise to do certain things, whether it be a landlord or Mr. Sherman, and we're paying money to that party.  And we expect those

> things that are required, that the contract calls for them to do those things. So if they're not being done, it's up to EyeMart Express to notify that party that they're breaching and to serve them notice to correct it.
> Q.   And to provide an opportunity to cure the breach?
> A.   And to provide an opportunity within that allotted time.

Herskovitz Deposition, p. 30.

None of these memoranda provided notification to M&S that it was breaching the Agreement or that it needed to correct that breach within an allotted time. There is no mention that the status of any particular location is delayed or problematic to EyeMart. EyeMart has acknowledged that none of these memoranda provided notice that EyeMart might consider terminating the Agreement. Herskovitz Deposition, p. 116. Likewise, none of these memoranda required a time frame to perform any of the tasks involved:

> Q.   . . . was there any specific deadline that was ever stated in any written documentation to M&S for performance of any of its tasks?
> A.   Can you ask that question again?
> A.   I'm reviewing. Sorry (Pause). No.

Herskovitz Deposition, p. 118. In fact, none of these memoranda even mentioned the Consulting Agreement. Herskovitz Deposition, p.118.

EyeMart argues that the Agreement does not specify that such information be included in the notice. Even if this argument is accepted, the lack of this information, coupled by the innocuousness of the memoranda cited, certainly can be considered by the Court in finding the memoranda cited as insufficient to constitute the notice of default required by the Agreement. In short, the memoranda do not provide the basic information for M&S to know that EyeMart believed it was in breach of the Agreement.

- 4 -

The fact that Mr. Sherman "admitted that he had received the written notices", EyeMart's Memorandum, p.4, is without avail. The memoranda were status reports of the progress on the various locations - - nothing more. This conclusion is further bolstered by the fact that the status memoranda were not exclusively addressed to Mr. Sherman but are also addressed to Mr. Grubb and Dr. Barnes. Why would notices of default to M&S also be addressed to EyeMart personnel? Because they were not notices of default but status updates.

EyeMart also relies on a surreptitiously recorded conversation with Mr. Sherman where he supposedly admits that he is aware EyeMart is unhappy with his efforts on its behalf. Yet, it is clear in that conversation that Mr. Sherman believes he is performing as required by the Agreement and that, to the extent EyeMart thinks otherwise, this is a result of misunderstanding. In fact, he asks that, if EyeMart is unhappy with his performance, it should meet with him to discuss the matter so that he could work out any problems. Herskovitz Deposition, Exhibit 18, p.13.

Likewise, EyeMart's reliance on <u>Violante v. Quadland Corp.</u>, No. 96-T-54731997 Ohio App. Lexis 3672 (Trumbull Cty. August 15, 1997) is misplaced. In that case, the court determined that the non-breaching party had provided ample notice of the breaches to the breaching party and further determined that the agreement in question did not require such notices to be in writing. Here, M&S had provided evidence of the work performed for EyeMart. In fact, such efforts resulted in at least three stores being opened in the short few months M&S provided services to EyeMart. Moreover, the Agreement in this case <u>does</u> require written notice of a default.

More importantly, the notice of default required by the Agreement was not given and there was no constructive or actual notice of it to M&S. The vague references in the status memoranda certainly did not so state nor were they understood as notices of default. As Mr. Sherman explained in his deposition, the references to "waiting on Marty" in these memoranda were "[n]ot waiting from the standpoint that there was a delay in my attention to getting to it. What Jonathan and I were saying constantly, 'We were continuing to work on this.'" Deposition of Martin Sherman filed separately and incorporated herein by reference ("Sherman Deposition"), pp. 143-144. M&S was not made aware of the concerns of EyeMart as to the alleged problems with its performance.

### B.   The Agreement Required Notice of a Default

EyeMart then asserts that the Agreement did not require notice for termination. This assertion is rebutted by the language of the Agreement:

> This Agreement may be terminated by either party for "Cause" which shall be defined as the breach of any material provision of this Agreement by the other party, which breach is not cured within thirty (30) days after written notice thereof is delivered to such other party . . .

EyeMart now claims that the use of the term "may" means that notice is allowed, but not required. This is not only contrary to the parties' agreement, but contrary to the basics of the English language.

Unlike the use of the term "may" to modify that one party "may serve the defaulting party written notice" in the case relied upon by EyeMart, here, there is no permissive term used to modify the giving of notice. Leghorn v. Wieland, 289 So. 2d 745, 166 (Fla. App. 1974). The term "may" here is only used to explain the right to terminate the Agreement, not the requirement to give notice. "Cause" is defined by the

Agreement as "the breach of any material provision of this Agreement by the other party, which breach is not cured within thirty (30) days after written notice thereof is delivered to such other party". Once those requirements have been met, "cause" exists and the non-breaching party then has the option of whether to continue with the Agreement or terminate it. That is why "may" is used in that sentence, to allow the non-breaching party the option of proceeding with the Agreement even when it has cause to terminate. The giving of written notice is not optional but is a prerequisite for "cause" for termination to exist. To argue otherwise is to convolute the clear terms of the Agreement in an attempt to escape the consequences of it.

    **C.**    **The Alleged Breach was Curable**

Next, EyeMart claims that no notice was required as the breach complained of – failing to schedule meetings at the ICSC Convention – was incurable. First, this assertion is factually incorrect. There is ample evidence that Mr. Sherman scheduled meetings for EyeMart during the convention in question. Mr. Sherman has set forth such evidence. Sherman Affidavit in Support of Motion for Summary Judgment filed separately and incorporated herein by reference ("Sherman Affidavit"), ¶9. Mr. Sherman's assertions have been corroborated by the independent testimony of Monica Smith, Lance Johnson and Joseph Aristone (representatives of various developers). Each of these representative testified that they had scheduled meetings at the ICSC Convention with Mr. Sherman prior to that convention to discuss EyeMart business. Deposition of Monica Smith filed separately and incorporated herein by reference ("Smith Deposition"), p. 13; Deposition of Lance Johnson filed separately and incorporated herein by reference ("Johnson Deposition"), p. 12; Deposition of Joseph

Aristone filed separately and incorporated herein by reference ("Aristone Deposition"), p. 9.

Second, even if EyeMart could have proven that no meetings had been scheduled and that this was material to the Agreement, its claim that such a failure is incurable is completely non-sensical. There was no magic to the ICSC Convention other than it provided a convenient location to meet with multiple developers at the same time. This was by no means the only way to meet with such developers, however. M&S and/or EyeMart could have set up other meetings with any of those developers at another time. EyeMart admitted as much. Deposition of Douglas Barnes filed separately and incorporated herein by reference ("Barnes Deposition"), p. 118. Therefore, M&S could have arranged for such meetings at another time and thus cured any alleged breach.

### D.    The Agreement is Not Ambiguous

EyeMart finally attempts to argue that the terms of the Agreement must be ambiguous and, therefore, are not subject to resolution at the summary judgment stage or extrinsic evidence should be used to interpret them. Whether contract terms are clear or ambiguous is a question of law for the court. Westfield Ins. Co. v. Huls Am., Inc., 128 Ohio App. 3d 270, 291, 714 N.E.2d 934, 947 (1998) (citation omitted). "Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions." Id. "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning. . . ." Alexander, 53 Ohio St. 2d at 245. "Furthermore, where the terms in an existing contract are clear and

unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." Id.

"The law favors an interpretation that gives a reasonable, lawful, and effective meaning to all manifestations of intent, rather than an interpretation that leaves part of the party's manifestation of intent unreasonable, unlawful, or of no effect." Linkey v. Med. Coll. of Ohio, 90 Ohio Misc. 2d 15, 695 N.E.2d 840 (Ct. Cl. 1997).  As set forth in Subsection B above, the reasonable meaning of the termination provision is that notice is required to provide cause for termination and a party may then decide whether or not to terminate the Agreement based on the cause presented.  EyeMart's attempts to argue otherwise are unreasonable and, therefore, do not create an ambiguity where none exists.

### III. **EYEMART'S BREACH OF CONTRACT CLAIM IS UNFOUNDED**

EyeMart disputes that M&S was providing the services required under the Agreement.  EyeMart Memorandum, p. 13.  Contrary to EyeMart's argument, M&S does not claim that M&S was not required to take any action under the Agreement, EyeMart Memorandum, p. 17.  Rather, M&S has called into question EyeMart's attempts to impose specific requirements upon M&S which were not imposed by the Agreement.  That is not to say that M&S was not required to perform under the Agreement.

Under the Agreement, M&S was to "act as EyeMart's exclusive leasing agent for all locations" and to "make Martin Sherman available at mutually agreed times and locations for such consultation and assistance as requested."  M&S did so.  Sherman Affidavit, ¶¶6-9.  It is well established that EyeMart cannot now impose specific duties

such as opening a set number of stores in a certain time frame or scheduling meetings at a particular convention when such requirements were not set out in the Agreement. As the Ohio Supreme Court has explained "'the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements'." Galmish v. Cicchini, 90 Ohio St. 3d 22, 27, 734 N.E. 2d 782, 788 (2000)(citation omitted).

"By prohibiting evidence of parol agreements, the rule seeks to insure the stability, predictability, and enforceability of finalized written instruments. It reflects and implements the legal preference, if not the talismanic legal primacy, historically given to writings. It effectuates a presumption that a subsequent written contract is of a higher nature than earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superceded by the written document." Galmish v. Cicchini, 90 Ohio St. 3d at 27-28.

EyeMart's claims that M&S failed to perform as required by the Agreement are simply unsupported. Several of the market opportunities targeted and developed by M&S's efforts were accepted by EyeMart and proceeded to the conclusion of lease agreements for the store locations. For example, M&S assisted EyeMart in locating and negotiating terms for locations in Ft. Wayne, Indiana; Lancaster, Pennsylvania; and York, Pennsylvania. In the short few months before termination of the Agreement, M&S also consulted with EyeMart regarding and/or negotiated for possible locations in Montgomery, Alabama; Bakersfield and Palm Springs, California; Champaign, Illinois; Portland, Maine; Fargo, North Dakota; Harrisburg and Pittsburgh, Pennsylvania;

Memphis, Tennessee and others. For various reasons, EyeMart decided not to proceed with those locations. Sherman Affidavit, ¶8.

The testimony of developers contacted by M&S shows the value of having M&S as a consultant. According to EyeMart's motion, one of its top priorities for a new store was York, Pennsylvania. EyeMart faults M&S for allegedly failing to immediately pursue that location. Yet, the matter was not as simple as EyeMart would like to believe. The mall representative, Lance Johnson, testified, there were two other optical stores already located in that mall and he had concerns about leasing to a third optical store tenant. Johnson Deposition, p. 9. In fact, but for the association with Mr. Sherman, that mall may not have leased space to EyeMart. Johnson Deposition, p. 10.

Likewise, M&S's involvement allowed a more efficient negotiation process as developers were familiar with Mr. Sherman and his reputation. As such, they knew they couldn't "pull the wool over his eyes" and were willing and able to negotiate the right deal quickly with his involvement. Smith Deposition, p. 20.

The point, however, is that if any of these efforts did not satisfy EyeMart, it had a remedy available to it in the Agreement – it could have given notice and an opportunity to cure. This, despite all its creative arguments, EyeMart did not do. Rather, it proceeded to terminate the Agreement and only belatedly tries to construct notices out of the day to day communications it had with M&S before that termination. Because the requisite notice of default was not given, EyeMart had no "cause" to terminate the Agreement and its termination of the Agreement without that cause was a breach which damaged M&S in the amounts set forth in its motion.[1]

---

[1] Which amounts have not been challenged in EyeMart's Memorandum.

## IV.   EYEMART'S PROMISSORY ESTOPPEL CLAIM IS BARRED

In its motion for summary judgment, M&S set forth the clear legal principles that preclude EyeMart from re-casting the same claims for breach of contract it has asserted as claims for promissory estoppel.  In EyeMart's Memorandum, EyeMart claims that it is entitled to plead in the alternative.  EyeMart relies on Schleicher v. Alliance Corporate Resources, Inc., No. 95APE03-311, 95 APE03-312, 1995 Ohio App. Lexis 5405 (Franklin Cty. December 7, 1995).   That case is inapplicable.  Although the Court in that case reversed the dismissal of the promissory estoppel claim on summary judgment, it did so because there was a question whether the parties had a meeting of the minds as to an employment agreement.  In that context, with a question as to whether an agreement was reached, it is understandable that the party would be entitled to plead in the alternative.  Here, there is no such question.

Moreover, Ohio courts have established that such a claim fails where it seeks to camouflage what at best is a breach of contract as tortious counduct.  Bowman v. Goldsmith Bros. Co. (Ct. App. 1952), 63 Ohio Law Abs.  428, 109 N.E. 2d 556 ("The mere omission to perform a contract obligation is never a tort unless the omission is also the omission to perform a legal duty.  In other words, an action of tort for negligence cannot be maintained unless the defendant's conduct constituted the breach of a duty imposed by law, apart from it being a breach of an obligation created by agreement of the parties…."); Battista, 538 F.2d at 117 ("A tort exists only if a party breaches duty which he owed to another independently of the contract, that is, a duty which would exist if no contract existed … The tort liability of parties to a contract arises from the breach of some positive legal duty imposed by law because of the relationship

of the parties, rather than a mere omission to perform a contract obligation.") (construing Ohio law). Therefore, EyeMart's claim fails as a matter of law and should be dismissed at this juncture.

## V.     CONCLUSION

In its motion for summary judgment, M&S set forth the factual and legal basis entitling it to summary judgment on its claim for breach of contract. EyeMart's convoluted arguments demonstrate the basic breach of the Agreement – unable to demonstrate the required notice and opportunity to cure required, EyeMart resorts to claiming that status memoranda were the required notice, that no notice was required at all, that the breach was incurable or that the Agreement was ambiguous. All these arguments must be seen for the desperate attempts they are to elude the legal consequences of EyeMart's actions in unilaterally terminating the Agreement.

Moreover, M&S has set forth the legal basis precluding the claims asserted by EyeMart. EyeMart failed to give notice, as required by the Agreement, of any alleged breaches or to exercise the remedy provided for them by the Agreement. Moreover, its claims are precluded by the parol evidence rule. Based on the foregoing, M&S respectfully requests that its motion be granted for judgment in its favor on the complaint and the counterclaims.

s/ Robert A. Pitcairn, Jr._____
Robert A. Pitcairn, Jr. (0010293)
Trial Attorney for Plaintiff
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202-4787
(513) 977-3477 – telephone
(513) 721-7120 – facsimile
rpitcairn@katzteller.com – e-mail

- 14 -

OF COUNSEL:

Wijdan Jreisat
Katz, Teller, Brant & Hild
255 East Fifth Street, Suite 2400
Cincinnati, Ohio 45202-4787
(513) 721-4532

- 15 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Plaintiff's Reply Memorandum in Support of Motion for Summary Judgment was served upon Michael W. Hawkins and Jon B. Allison, Trial Attorneys for Defendant, Dinsmore & Shohl, 255 E. Fifth Street, Suite 1900, Cincinnati, Ohio 45202 via United States Mail this 19th day of April, 2004.

                                      s/ Robert A. Pitcairn, Jr._____
                                      Robert A. Pitcairn, Jr.

KTBH:600002.1