**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| M&S ADVISORY GROUP, INC., | : | Case No. C-1-02-522 |
| | : | |
| Plaintiff, | : | Judge Spiegel |
| | : | Magistrate Judge Hogan |
| v. | : | |
| | : | **DEFENDANT EYEMART EXPRESS** |
| EYEMART EXPRESS, LTD., | : | **LTD.'S REPLY MEMORANDUM IN** |
| | : | **SUPPORT OF ITS MOTION FOR** |
| Defendant. | : | **SUMMARY JUDGMENT** |

## I.    INTRODUCTION

On March 15, 2004, Defendant EyeMart Express, Ltd. filed its Motion for Summary Judgment and Memorandum in Support ("EyeMart's Memorandum") on its counterclaims of promissory estoppel and breach of contract against Plaintiff M&S Advisory Group, Inc. M&S filed its Motion for Summary Judgment against EyeMart on the same day claiming M&S was entitled to summary judgment on its breach of contract claim and on EyeMart's counterclaims of breach of contract and promissory estoppel. EyeMart has demonstrated, in its Memorandum,[1] that it is entitled to summary judgment on its counterclaims. M&S, therefore, is not entitled to summary judgment on EyeMart's counterclaims. In addition, M&S is not entitled to summary judgment on its breach of contract claim for the reasons set forth in EyeMart's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("EyeMart's Opposition").

---

[1] EyeMart hereby incorporates by reference its Memorandum in Support.

II.   **ARGUMENT**

    A.   **EyeMart Is Entitled To Summary Judgment On Its Breach Of Contract Claim.**

       1.   **M&S's Duties Under The Agreement Were Clear.**

M&S asserts, in its Memorandum in Opposition to Defendant's Motion for Summary Judgment ("M&S's Opposition"), that EyeMart cannot demonstrate M&S breached the Agreement because M&S's duties were not specifically enumerated in the Agreement.  (M&S's Opposition 2-4).  This is simply not the case.  Under the Agreement, it is clear M&S was to act as EyeMart's exclusive leasing agent for all locations and it was to make Sherman available at mutually agreed times and locations as requested to implement EyeMart's strategic plan by selecting retail store locations and by negotiating leases for those locations.  (Pl. Exh. 1). Sherman was well aware of EyeMart's strategic plan.  Sherman discussed the strategic plan with Dr. Barnes prior to the execution of the Agreement and participated in a three-day meeting during which the strategic plan was discussed and further developed.  (Barnes Depo. 23-34, 47-49, 52-54, 57, 63-64; Herskovitz Depo. 38-39; Grubb Depo. 11-12).  A reference list was created during the strategy meeting ranking cities in groups in order of priority and Sherman had a copy of this list for his use.  (Df. Exh. 1; Barnes Depo. 58-60; Herskovitz Depo. 48-49; Grubb Depo. 13).  Also, during the strategy meeting, Sherman, as part of the strategic plan, told EyeMart representatives (as he did throughout the relationship) that it was important that they come to the ICSC in Las Vegas in May of 2002 and Sherman would arrange for meetings between EyeMart and many of the major players in the real estate development industry.  (Barnes Depo. 70; Herskovitz Depo. 174; Krall Depo. 26-27, 38).

In addition, at the time of the strategy meeting, EyeMart had already scouted and selected a number of specific locations it wanted Sherman to pursue and had advised Sherman of such

locations.  (Df. Exh. 2; Barnes Depo. 49, 56-59; Herskovitz Depo. 38, 46-48, 58-59, 64, 78-82; Grubb Depo. 13).  Also, Sherman was aware through various communications from EyeMart, including written notices, that the highest priority locations were in Harrisburg, York and Lancaster, Pennsylvania.  (Df. Exhs. 2, 6, 9, 10 and 12; Barnes Depo. 56, 59, 61, 74, 80-84; Herskovitz Depo. 35-36, 47, 58-59, 62, 64-67; Grubb Depo. 13, 25-26, 31-32, 36-37).  Sherman testified in his deposition that EyeMart's priorities were his priorities.  (Sherman Depo. 33).  In fact, in M&S's Memorandum in Support of its Motion for Summary Judgment, M&S concedes that EyeMart's strategic plan was to "**open approximately fifteen new stores each year . . . in the predetermined strategic markets**." (M&S's Memorandum 3; Sherman Affidavit ¶¶ 6-7) (emphasis added).

Despite the language in the Agreement and Sherman's clear understanding of EyeMart's strategic plan, M&S claims that EyeMart cannot assert a breach of contract claim on the basis of Sherman's failure to pursue designated priority locations on behalf of EyeMart as part of the strategic plan or on the basis of Sherman's failure to arrange for any meetings for EyeMart with anyone at the ICSC convention as part of the strategic plan because the specific locations and the specific convention were not listed in the Agreement.  (M&S's Opposition 2-4).  In other words, M&S has taken the position that Sherman was not required to take any action under the Agreement or that he could do whatever he wanted to do and whenever he wanted to do it.  This is not a reasonable interpretation of the Agreement.  Rather, it is clear that M&S was to implement EyeMart's strategic plan under the terms of the Agreement, including pursuing locations EyeMart wished to pursue and arranging for meetings at the convention.  However, although the Agreement is not ambiguous, in order to assess the intent of the parties as to M&S's

responsibilities under the Agreement, this Court should allow extrinsic evidence, including the preliminary negotiations of the parties prior to the execution of the Agreement.

The Sixth Circuit has held, "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." United Mine Workers of America, International Union v. Cyprus Mountain Coals Corp., 2002 U.S. App. LEXIS 24549 at *8 (December 2, 2002, 6th Cir.) (holding that a district court must allow evidence or argument regarding the intended meaning of the parties' agreement) (attached to EyeMart's Opposition as Exh. E); International Union, United Auto Workers v. Yard-Man, Inc., 716 F.2d 1467, 1479-1480 (6th Cir. 1983).

The Seventh Circuit has held, "the language of a contract cannot be properly understood if it is read without attention to the circumstances under which it was written . . .  In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed . . . Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish."  Florida East Coast Railway Company v. CSX Transportation, Inc., 42 F.3d 1125, 1129 (7th Cir. 1994).

A review of the extrinsic evidence in this case makes it abundantly clear that the parties intended that M&S, pursuant to the Agreement, was responsible for pursuing locations which EyeMart wished to pursue as part of the strategic plan and for arranging for meetings between EyeMart and major players in the real estate development industry at the ICSC convention in Las Vegas as part of the strategic plan.

### 2.      M&S Did Not Perform Under The Agreement.

M&S, in its Opposition, states that EyeMart's claims that M&S failed to perform as required by the Agreement are unsupported.  (M&S's Opposition 2, 5).  This is untrue.

### a. M&S Did Not Pursue Locations.

M&S claims, in its Opposition, that "market opportunities targeted and developed by M&S's efforts were accepted by EyeMart and proceeded to the conclusion of lease agreements for the store locations."  (M&S's Opposition 5).  In reality, M&S did not target any store locations for EyeMart.  Rather, EyeMart informed Sherman in writing of the locations it wished to pursue during the first month of the Agreement.  (Df. Exhs. 1, 2, 6; Barnes Depo. 81-91; Herskovitz Depo. 64-67, 75, 90; Grubb Depo. 13-15, 26; Sherman Depo. 110, 115-116, 119-120, 131).  From February to May of 2002, Herskovitz sent Sherman four written notices regarding these locations.  (Df. Exhs. 6, 9, 10 and 12; Barnes Depo. 45-46, 121-128; Herskovitz Depo. 75, 90, 105-109; Sherman Depo. 142, 147-148, 153-154).  However, during the four-month period in which the Agreement was in effect, Sherman failed to negotiate a single lease or open even one store location on behalf of EyeMart.  (Barnes Depo. 76, 131; Herskovitz Depo. 188).

With regard to the twelve locations M&S, in its Opposition, claims it worked on, there is no evidence that M&S did more than make a telephone call with regard to most of them.  (Barnes Depo. 139-152).  More importantly, as set forth in EyeMart's Memorandum at 11-13, it is clear that with regard to locations that had been identified as priority locations from the beginning of the Agreement as part of the strategic plan, including locations in Harrisburg, York and Lancaster, Pennsylvania, Sherman did not take any action for multiple months.  (Barnes Depo. 73-74; Herskovitz Depo. 104; Grubb Depo. 73).  Sherman never made an attempt (not even a telephone call) to pursue the Paxton Towne Centre in Harrisburg, Pennsylvania, from

February through April, even though it had been designated a priority location in early February and even though he received four written notices regarding this location, on February 28, March 21, March 26 and April 16. (Df. Exhs. 6, 9, 10 and 12; Aristone Depo. 6-7; Barnes Depo. 73-74, 84; Herskovitz Depo. 69-70, 83; Grubb Depo. 86; Sherman Depo. 110). In addition to his breach regarding the Paxton Towne Centre, Sherman, during the same months, also did not attempt (again not even a telephone call) to pursue the York Galleria, another priority location for which Sherman received the same written notices.[2] (Df. Exhs. 6, 9, 10 and 12; Johnson Depo. 5-6, 9, 24-25; Barnes Depo. 73-74; Herskovitz Depo. 71; Grubb Depo. 27-28, 85-86; Sherman Depo. 115-116). For M&S to suggest that it performed under the Agreement when the evidence clearly shows that all Sherman managed to do in nearly four months was make a few telephone calls and where the evidence clearly shows that Sherman failed to even attempt to pursue the locations EyeMart designated as priority locations is preposterous.

### b. M&S Did Not Arrange Meetings At The ICSC.

M&S claims, in its Opposition, that Sherman set meetings with a total of three persons at the three-day May 2002 ICSC convention in Las Vegas to discuss possible locations for EyeMart. (M&S's Opposition 9). Sherman, however, did not arrange for any meetings for EyeMart with anyone. (Barnes Depo. 103-110; Krall Depo. 43-44; Sherman Depo. 202). Sherman instead filled his three-day convention schedule with half-hour meetings for his other client, Crabtree & Evelyn. (Barnes Depo. 103-110; Krall Depo. 33-34; Sherman Depo. 202). The Crabtree & Evelyn representatives who attended the convention confirmed, in their respective depositions, that they were scheduled to spend the entire convention in meetings with

---

[2]  M&S asserts, in its Opposition, that EyeMart faulted Sherman for not immediately consummating a lease at the York Galleria when a number of spaces were available. (M&S's Opposition 5). Such is not the case. EyeMart faulted Sherman for not even attempting to pursue a location in the York Galleria for months despite the fact that a number of spaces were available, and for lying to EyeMart by representing that no spaces were available.

Sherman. (Kelleher Depo. 35-37, 44, 48, 53-55; Rice Depo. 17-19, 21, 24). In fact, they did not even know that EyeMart would be attending the convention. (Kelleher Depo. 48; Rice Depo. 41). In addition, Monica Smith[3] (one of the three persons who allegedly was to meet with EyeMart) testified in her deposition that, she arranged for the meeting she had with Sherman, the meeting was primarily to discuss Crabtree & Evelyn business, and Crabtree & Evelyn representatives attended the meeting while EyeMart representatives did not. (Smith Depo. 28-30). To the extent that Sherman was set to discuss EyeMart business with anyone at the convention, he did not make EyeMart aware of any such discussions and he did not schedule EyeMart representatives to be present during any of these discussions. (Barnes Depo. 103-110). In addition, given that the convention was for three days and that Sherman could have attended somewhere in the neighborhood of fifty meetings to discuss EyeMart business, his assertion that he was set to discuss EyeMart business with only three persons does not support Sherman's position that he performed under the Agreement at the ICSC.

M&S then attempts to trivialize the ICSC convention in Las Vegas, stating there is no "magic" to it and that M&S "could have cured whatever defaults" it made. (M&S's Opposition 9). This is not true. From the beginning of the relationship between M&S and EyeMart, Sherman told EyeMart that its representatives, and specifically Dr. Barnes, should attend the ICSC convention in Las Vegas in May of 2002 so that they could meet face-to-face with and begin to establish relationships with major players in the real estate development industry. (Barnes Depo. 70, 93-95, 156; Herskovitz Depo. 174, 178; Krall Depo. 26-27, 38).

As the convention was held on an annual basis, there was no way for EyeMart representatives to have the same opportunity to meet face-to-face with major players in the real

---

[3]   M&S cites to Smith's testimony as the only support for its assertion that M&S makes the negotiation process more efficient. (M&S's Opposition 6). However, Smith testified that she has only ever completed one deal with M&S, a renewal lease for Crabtree & Evelyn. (Smith Depo. 19).

estate development industry as part of the strategic plan. As Crabtree & Evelyn representative Kelleher testified in his deposition, the ICSC convention in Las Vegas is the largest convention of its kind (twenty-five to twenty-seven thousand attendees) and it is the best opportunity for companies to meet with the greatest number of real estate developers at one time and to establish relationships with those developers. (Kelleher Depo. 24, 29). Due to Sherman's failure to arrange for any meetings for EyeMart, EyeMart lost this opportunity and certainly any opportunity to open twelve plus stores in the first year of the Agreement. M&S now suggests that it could have cured the breach, apparently by having EyeMart fly all over the country to meet with the developers who attended the convention. This suggestion is ridiculous.

### 3.    EyeMart Provided Written Notice And An Opportunity To Cure.

M&S asserts, in its Opposition, that EyeMart cannot recover on its breach of contract claim because EyeMart did not provide M&S with written notice and an opportunity to cure M&S's breaches.[4] (M&S's Opposition 6). M&S claims the written notices EyeMart did provide were legally insufficient to put M&S on notice of its breaches because they did not refer to the Agreement, they did not specifically state that Sherman's delays in performance were a problem (although they did state EyeMart was "waiting on Marty" to complete a number of tasks), they did not set forth a time frame in which M&S was to complete a given task and they did not state that the Agreement would be terminated if M&S continued to fail to perform. (M&S's Opposition 6-9). Again, M&S is incorrect.

The fact is, EyeMart provided written notice of M&S's breaches and an opportunity to cure consistent with the Agreement. While the Agreement does state that notice must be in

---

[4]    M&S also asserts that EyeMart did not provide evidence to support the damages incurred due to M&S's breaches. (M&S's Opposition 2). While EyeMart, in its Memorandum, did list the damages it incurred, EyeMart attaches hereto as Exh. A its Amended Responses to Plaintiff's Third Set of Interrogatories to Defendant setting forth the calculations for all damages that EyeMart incurred.

writing, it does not state what words must be contained in the notice. (Pl. Exh. 1). Contrary to M&S's position as to what the Agreement requires, the Agreement does not state that the notice must refer specifically to the Agreement, that the notice must include certain words to convey that delays in performance are problematic, that the notice must warn of termination, or that the notice must specifically provide that the breaching party will have thirty days to cure the breach. EyeMart representatives testified in their respective depositions that Herskovitz was instructed to send written notices and that he, in fact, did send written notices to Sherman in case the Agreement had to be terminated due to Sherman's failure to perform.[5] (Barnes Depo. 81-89; Herskovitz Depo. 69, 73, 75, 79-80, 88-89; Grubb Depo. 81-83).

In addition to and in connection with these written notices, Herskovitz was on the telephone with Sherman several times a week to discuss Sherman's failure to make progress with regard to the locations EyeMart wished to pursue. (Herskovitz Depo. 83-84, 94-95, 109). During a telephone conversation with EyeMart representatives on May 13, 2002, Sherman admitted that he had received the written notices, that he was failing to perform under the Agreement and that he was aware EyeMart was not satisfied with his performance. (Pl. Exh. 18 at 6, 8, 10-16, 18, 20-21, 24-25, 30-32, 37; Herskovitz Affidavit ¶ 3, attached to EyeMart's Opposition as Exh. A). Sherman cannot now claim that the notices were insufficient and that he was unaware of his breaches. EyeMart's written notices complied with the Agreement, M&S was on notice of its breaches and EyeMart was legally entitled to terminate the Agreement when it did. See Violante v. Quadland Corp., 1997 Ohio App. LEXIS 3672 at *18-*21 (August 15, 1997, 11th Dist.) (attached to EyeMart's Opposition as Exh. B).

---

[5]    M&S, in its Opposition, questions why Herskovitz would copy EyeMart representatives Dr. Barnes and Grubb on notices sent to Sherman. (M&S's Opposition 7-8). The answer is obvious. Herskovitz wanted Dr. Barnes and Grubb to be aware of the notices he sent to Sherman.

Even if EyeMart had not provided notice consistent with the terms of the Agreement, courts have consistently found that failing to follow written notice provisions in contracts can be construed as harmless where, as here, there is evidence of constructive or actual notice. See Daniel E. Terreri & Sons, Inc. v. Board of Mahoning County Commissioners, 786 N.E.2d 921, 932 (Ohio App. 2003); Roger J. Au & Son, Inc. v. Northeast Ohio Regional Sewer District, 504 N.E.2d 1209, 1216 (Ohio App. 1986).

EyeMart has demonstrated, in its Memorandum and above, that the Agreement required M&S to implement EyeMart's strategic plan, including pursuing locations EyeMart wished to pursue and arranging for meetings at the ICSC convention. EyeMart has further demonstrated that M&S did not do what was required under the Agreement and that EyeMart provided written notice of M&S's breaches and an opportunity to cure prior to terminating the Agreement. Therefore, EyeMart is entitled to summary judgment on its breach of contract claim.

**B.    EyeMart Is Entitled To Summary Judgment On It's Promissory Estoppel Claim.**

M&S claims, in its Opposition, that EyeMart cannot assert a claim for promissory estoppel if it has asserted a breach of contract claim. (M&S's Opposition 2, 10-14). However, courts have consistently held that a party may plead and present both breach of contract and promissory estoppel theories to the trier of fact and that, to completely bar one theory at the summary judgment phase is inappropriate. See Schleicher v. Alliance Corporate Resources, Inc., 1995 Ohio App. LEXIS 5405 at *14 (December 7, 1995, 10th Dist.) (attached to EyeMart's Opposition as Exh. F); Stroble v. Sir Speedy Printing Center, 589 N.E.2d 449 (Ohio App. 1990); Pond v. Devon Hotels, Ltd., 563 N.E.2d 738 (Ohio App. 1988).

EyeMart, in its Memorandum at 17-18, has demonstrated that it is entitled to summary judgment on its promissory estoppel claim. M&S, in its Opposition, does not even attempt to

assert that Sherman did not make promises to EyeMart or that EyeMart did not justifiably rely to its detriment on these promises.  While EyeMart may not be permitted a double recovery with regard its damages, to any extent this Court finds EyeMart is not entitled to certain damages due to M&S's breaches of the Agreement, this Court may award such damages based on the promises Sherman made to EyeMart and failed to fulfill.  See Schleicher, 1995 Ohio App. LEXIS 5405 at *14.

## III.    CONCLUSION

For all of the foregoing reasons, EyeMart Express, Ltd.'s Motion for Summary Judgment should be granted in its entirety.

Respectfully submitted,

/s/ Michael W. Hawkins
Michael W. Hawkins (0012707)
Jon B. Allison (0073955)
DINSMORE & SHOHL, LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio  45202
513/977-8200 (Phone)
513/977-8141 (Fax)
Trial Attorneys for Defendant,
EyeMart Express, Ltd.

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert A. Pitcairn, Jr., Esq.
Wijdan Jreisat, Esq.
Katz, Teller, Brant & Hild
255 East Fifth Street
Suite 2400
Cincinnati, Ohio 45202-4787

/s/ Michael W. Hawkins
Michael W. Hawkins (0012707)