UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

M&S ADVISORY GROUP, INC.,      :
                               :   NO. 1:02-CV-00522
        Plaintiff,             :
                               :
                               :   **ORDER**
   v.                          :
                               :
                               :
EYEMART EXPRESS, LTD.,         :
                               :
        Defendant.             :


        Plaintiff M&S Advisory Group ("M&S") filed the instant
suit in the Hamilton County Court of Common Pleas against Defendant
Eyemart Express, Ltd. ("Eyemart"), raising claims based on an
alleged unlawful termination of his services and failure to pay
upon a contract therefor.    After removal, Eyemart filed a
counterclaim, subsequently amended (docs. 20, 26), alleging breach
of contract and promissory estoppel claims.[1]  M&S and Eyemart have
filed cross-motions for summary judgment pursuant to Fed. R. Civ.
P. 56, claiming that they are entitled to judgment in their
respective favor on all claims and counterclaims (docs. 48, 49).
In subsequent briefing, each party has responded to its opponent's
motion (docs. 56, 57) and replied in support of its own (docs. 60,

---

[1] Eyemart also filed a motion to amend its counterclaim
pursuant to Fed. R. Civ. P. 15 to include a claim for fraud
arising from the events at issue (doc. 52).  It claims that
"newly discovered evidence" produced during discovery leads to
the conclusion that M&S "never intended to provide the consulting
services [it] agreed to provide" Eyemart (Id.).  The Court will
resolve this motion infra.

61).  Accordingly,  these  motions  are  fully  briefed  and  ripe  for
decision.   For  the  following  reasons,  Plaintiff's  motion  for
summary  judgment  will  be  granted,  and  Defendant's  motion  for
summary judgment will be denied.

## I. APPLICABLE LEGAL STANDARD

Although  a  grant  of  summary  judgment  is  not  a  substitute
for  trial,  it  is  appropriate  "if  the  pleadings,  depositions,
answers  to  interrogatories,  and  admissions  on  file,  together  with
the  affidavits,  if  any,  show  that  there  is  no  genuine  issue  as  to
any  material  fact  and  that  the  moving  party  is  entitled  to  a
judgment  as  a  matter  of  law."  Id.; see  also,  e.g.,  Poller v.
Columbia Broadcasting System, Inc., 368 U.S. 464 (1962); LaPointe
v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993);
Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental
Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992)(per curiam).  In
reviewing  the  instant  motion,  "this  Court  must  determine  whether
the  evidence  presents  a  sufficient  disagreement  to  require
submission  to  a  jury  or  whether  it  is  so  one-sided  that  one  party
must  prevail  as  a  matter  of  law."  Patton v. Bearden, 8 F.3d 343,
346 (6th Cir.1993), quoting in part Anderson v. Liberty Lobby,
Inc.,  477  U.S.  242,  251-52  (1986)(internal  quotation  marks
omitted).

The  process  of  moving  for  and  evaluating  a  motion  for
summary  judgment  and  the  respective  burdens  it  imposes  upon  the

movant and the non-movant are well settled.   First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).   The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.   See Celotex, 477 U.S. 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).   As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added);

-3-

see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir.1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir.1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir.1989)(internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir.1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co.

-4-

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H.
Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc.,
369 U.S. 654 (1962).  Furthermore, the district court may not weigh
evidence or assess the credibility of witnesses in deciding the
motion.  See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

        Ultimately, the movant bears the burden of demonstrating
that no material facts are in dispute.  See Matsushita, 475 U.S. at
587.  The fact that the non-moving party fails to respond to the
motion does not lessen the burden on either the moving party or the
Court to demonstrate that summary judgment is appropriate.  See
Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55
(6th Cir. 1991).

## II. RELEVANT FACTUAL BACKGROUND

        Many of the facts giving rise to the instant lawsuit are
undisputed.  As drawn from the Complaint, the motions and
subsequent briefing of the parties, and the evidentiary submissions
in support thereof, the facts may be fairly summarized as follows.

        EyeMart is engaged in the retail optical eyewear industry
and operates approximately sixty-five stores across the country.
It was founded in 1990 by Dr. H. Doug Barnes ("Barnes"), and he
remains the owner and president. In late 2001, EyeMart was
proceeding with plans to grow its national operations by opening
additional stores in shopping malls and other retail locations
throughout the country. At that time, EyeMart employed consultant

-5-

Michael Packard to "assist it in its overall operations" (doc. 49).
Packard recommended hiring Martin Sherman, a consultant
specializing in retail expansion and lease negotiations and sole
owner and only consultant of Plaintiff M & S. Sherman enjoyed
substantial experience in the real estate development industry in
both in-house and consulting roles, including prior experience with
LensCrafters, an EyeMart competitor. It was expected he would lend
the necessary expertise and valuable business contacts EyeMart
lacked in its plans to expand its domestic retail presence.[2]

EyeMart contends that during the discussions and
negotiations between EyeMart and Sherman, Sherman made a number of
representations regarding services he would provide to EyeMart.[3]

_____

[2] EyeMart contends that two Eyemart senior vice presidents,
Jonathan Herskovitz and Frederick Grubb, were "solely responsible
for growing the company by adding store locations" prior to
Sherman's hire (doc. 49). It avers that Sherman "represented
that [they] could relinquish their responsibilities regarding
negotiating leases" upon his engagement (Id.).

[3] In its motion, EyeMart claims that Sherman repeatedly
promised to do the following, both before and after entering the
written agreement: (1) fully negotiate leases for EyeMart, (2)
enable it to open 12 to 18 store locations within the first year
of [entering] a Consulting Agreement, (3) obtain better lease
rates than EyeMart otherwise could due to his reputation in the
real estate development industry and his personal relationships
with others in the industry, (4) get EyeMart into locations that
they [sic] otherwise could not get into, (5) travel to scout out
locations for EyeMart, (6) provide sales numbers of LensCrafters
locations to assist EyeMart in selecting locations that would be
the most profitable, and (7) devote the time necessary to ensure
that EyeMart achieved its goals" (doc. 49). It also alleges that
Sherman advised EyeMart to attend the International Council of
Shopping Centers ("ICSC") conference held in Las Vegas in May
2002. He promised that he would arrange "for meetings between

-6-

Regardless of the accuracy of these promises, it is uncontested that EyeMart entered into a consulting agreement ("the Agreement") with M&S whereby Sherman was obligated to provide a number of services on behalf of EyeMart.    It provides, in relevant part:

> 2. <u>Retainer of Consultant</u>. During the term of this Agreement, EyeMart will retain Consultant on matters relating to the strategy of selecting retail store locations, implementation of the strategy, and lease negotiations. Consultant shall make Martin Sherman available at mutually agreed times and locations for such consultation and assistance as requested and Consultant and Martin Sherman may represent themselves as "Director of Retail Development" of EyeMart or other such title as mutually agreed upon by the parties. The parties anticipate that Martin Sherman will attend meetings at EyeMart headquarters as necessary for the purpose of discussion of lease negotiations and ongoing site selection strategy.    All communications from the Consultant to Eyemart shall be made to such individuals as may be designated by Eyemart.

(doc. 1).    The Agreement established a two-year initial term commencing on February 1, 2002 and concluding on January 31, 2004. In exchange for Sherman's services, EyeMart was required to pay M&S a guaranteed minimum of basic and consulting fees in the amount of $200,000 per year; M&S also enjoyed the opportunity to earn additional consulting fees based upon leases and lease renewals

---

EyeMart and many of the major players in the real estate development industry at this convention" (<u>Id</u>.).    Finally, Eyemart contends that Sherman "promised" that he would establish EyeMart locations in specifically desired locations, including "the Barton Creek Mall in Austin, Texas and the North Star Mall in San Antonio, Texas" (<u>Id</u>.).

entered on behalf of EyeMart.  Furthermore, M&S was to be reimbursed for its reasonable expenses incurred in performance of the Agreement.

As is particularly significant in the instant dispute, the Agreement also contained a number of specific provisions related to the breach and termination thereof.  It provides, again in relevant part:

> 7. <u>Term</u>
> a. Subject to the following provisions, the initial term of this Agreement shall commence as of the 1st day of February 2002 and continue thereafter until January 31, 2004. This Agreement shall be continuously extended thereafter unless either party gives twelve months written notice to the other; provided, however, that such notice cannot be given prior to February 1, 2003 so that it is effective no earlier than January 31, 2004.
>
> b. This Agreement may be terminated by either party for "Cause" which shall be defined as the breach of any material provision of this Agreement by the other party, which breach is not cured within thirty (30) days after written notice thereof is delivered to such other party, or Consultant's failure by reason of his health to make Martin Sherman available on a continuing and active basis as principal to provide the services set forth hereunder.
>
> c. In the event that Martin Sherman is unable to perform his duties for Consultant under this Agreement, either due to illness, disability or death, Consultant may substitute another individual on a non-exclusive basis who is reasonably acceptable to EyeMart to complete any deals which have been substantially negotiated by Martin Sherman prior to his unavailability....
>
> ...

10. <u>General Provisions</u>

...

d. <u>Entire Agreement</u>.  This Agreement (i) constitutes the entire Agreement between EyeMart, Martin Sherman and Consultant in connection with the subject matter of this Agreement, (ii) supersedes any and all other agreements, either oral or written, between EyeMart, Martin Sherman, and Consultant in connection with the subject matter of this Agreement, and (iii) may not be modified orally and no modification shall be effective unless in writing and signed by EyeMart, Martin Sherman, and Consultant.

...

g. <u>Notice</u>.  Any notice required hereunder shall be delivered in writing in hand or at the address indicated in the first paragraph hereof by certified mail, return receipt requested, or by overnight courier with proof of delivery.

(doc. 1).

After the contract was executed, Sherman met with key EyeMart representatives over the course of three days to discuss and develop EyeMart's strategic plan.  EyeMart avers that it intended to continue "what had been a successful strategy" of focusing on developing stores in "strip centers" and "free standing locations" in "secondary markets" (doc. 49).  EyeMart purports that it had "already scouted and selected a number of specific locations" on which it wanted Sherman "to focus his efforts... in the initial weeks after the execution of the Agreement" (<u>Id</u>.).  In doing so, those present at the strategy meeting created a list

-9-

ranking the target cities "in groups by order of priority" (Id.).
Allegedly, Sherman repeated his promises to fulfill his
obligations, including the establishment of a certain number of
store locations within the first year of the Agreement.

At this point, the parties' characterizations of
subsequent events and Sherman's under the Agreement diverge.  M&S
contends that, "[i]n the short few months in which [it] provided
services to EyeMart," it began developing appropriate locations to
support the strategic plan, began renewing leases for existing
EyeMart stores, and "developed various opportunities to locate
stores in the predetermined strategic markets" (doc. 48).
Specifically, it contends that it successfully assisted EyeMart in
"locating and negotiating terms for locations in Ft. Wayne,
Indiana; Lancaster, Pennsylvania; and York, Pennsylvania" (Id.).
It also provided consultation and/or negotiation support for
additional locations across the country that, for some reason,
EyeMart decided not to pursue further.  M&S and Sherman also "made
plans" to attend the 2002 ICSC Conference in Las Vegas (Id.)
Sherman avers that he arranged a number of meetings with property
owners, managers, or leasing agents to explore and/or negotiate
additional EyeMart locations, and he invited EyeMart principals,
including Barnes, Herskovitz, and Grubb, to participate.  Despite
these efforts, however, M&S contends that EyeMart was "[a]llegedly
unhappy with this effort" and, by letter dated May 23, 2002,

-10-

"abruptly terminated the Agreement" between the parties" (<u>Id</u>.)

EyeMart, however, has a distinctly different impression of the Plaintiff's and Sherman's performance. As of the time of the initial February strategy meeting, Barnes and Herskovitz claim that they "had their doubts and concerns about Sherman's capabilities" (doc. 49). They noted that he seemed "absent minded and forgetful" and that he "fail[ed] to remember important" facts and issues raised in prior conversations (<u>Id</u>.). Simply put, based upon their own "experience [in] selecting locations, making contacts with real estate developers, and negotiating leases," the main EyeMart representatives "knew...Sherman was not performing under the Agreement and as promised" (<u>Id</u>.). He failed to provide consistent, reliable information regarding LensCrafters' operations he purportedly enjoyed and failed to pursue the locations EyeMart repeatedly designated as "priority locations" (<u>Id</u>.). Despite daily efforts by EyeMart representatives to ascertain his progress and to spur him to pursue certain locations with more vigor, Sherman failed to do so, either assuring them that he was "working on it" or intimating that he was an expert in the field and that they were in no position to question his methods (<u>Id</u>.). EyeMart avers that it discovered, through parallel efforts of its own representatives, that Sherman failed to make any substantive efforts to pursue a number of the locations it specified in the initial strategy meetings or in subsequent discussions. As a result, EyeMart

-11-

representatives were required to assume responsibility for site selection and retention, responsibilities that the Agreement contemplated Sherman and M&S would pursue on the company's behalf. In fact, in doing so, Eyemart contends that it learned that Sherman actively misrepresented the availability of certain locations and of his efforts to obtain them on behalf of his client.

Approximately one month after the signing of the Agreement, in light of the shared concerns of the EyeMart representatives, Dr. Barnes ordered Herskovitz to send Sherman "written notices" of alleged concerns regarding his performance. From February 2002 to May 2002, Herskovitz sent Sherman four written notices, all of which identified specific locations "EyeMart expected Sherman to pursue on its behalf" (Id.).  In its motion, EyeMart characterizes these as "written notices of Sherman's nonperformance and of what EyeMart wanted accomplished in case the Agreement had to be terminated due to Sherman's failure to perform" (Id.).  However, a facial review of the mailings reveals that they are not so precisely stated.  All of them appear to be rather informal; the first one is captioned "Doug Barnes Wish List" (doc. 48).  They appear to request status updates on a number of projects, and, fairly stated, all appear rather positive in tone. None of them contain any language that they serve to provide him "notice" under the Agreement or otherwise specifically state that he has breached the Agreement in any manner.  In fact, they fail

even to specifically note that any of the purported delays were causing EyeMart distress. EyeMart contends, however, that, in conjunction with the telephone calls, Sherman and M&S were well aware of their dissatisfaction and his perceived nonperformance.

Dissatisfaction escalated on or about May 10, 2002, when EyeMart initiated a conference call with Sherman after receiving an allegedly unauthorized and uncontemplated bill for a trip to Chicago Sherman took to meet with a real estate developer. EyeMart contends that the trip was largely made on behalf of one of Sherman's other clients, Crabtree & Evelyn, and that it had recently met with the developer on its own. Nonetheless, Sherman was billing EyeMart for half of the expenses for this trip, an expenditure EyeMart felt was unjustifiable. EyeMart contends that Sherman was very defensive during the call and that, ultimately, he "acknowledged his failings on behalf of EyeMart and that EyeMart was unhappy with him" (doc. 49).[4] Sherman allegedly contended that the mistrust between the parties rendered him uncomfortable with the relationship; at the conclusion of the call, Eyemart's representatives were "under the impression that Sherman was terminating the Agreement" (Id.). Although subsequent calls over the next two days confirmed the continuing relationship under the Agreement, Eyemart maintains that its representatives were "extremely concerned" about Sherman's performance (Id.).

---

[4] Unsurprisingly, Sherman and M&S dispute this assertion.

-13-

Nonetheless, they "held out hope that Sherman could resurrect himself at the ICSC" where he had "promised to schedule many meetings for EyeMart with major players in the real estate industry" (Id.).

Unfortunately, these hopes were unfulfilled. Dr. Barnes, Herskovitz, and Grubb (among others), flew to Las Vegas to attend the conference from May 20, 2002 through May 22, 2002. Upon arrival, however, they learned that Sherman had no meetings set up with any companies attending the convention, instead focusing on representing Crabtree & Evelyn over the three days. Sherman stated, however, that he would mention EyeMart during some of these scheduled meetings and that he would have dinner with Dr. Barnes that evening; after Dr. Barnes expressed outrage, he offered to allow EyeMart representatives to attend a few of the scheduled meetings with Crabtree & Evelyn. Dissatisfied, Dr. Barnes left to consult with the other EyeMart representative present. After discussing the matter, Dr. Barnes called Sherman on his cell phone and left the following message: "[D]inner is cancelled and so are you" (doc. 49). Following the convention, Dr. Barnes sent a letter to Sherman formally terminating the Agreement. The instant suit followed.

## III. LAW AND DISCUSSION

Based upon these events, M&S claims that EyeMart breached the contract by terminating the Agreement without following the

-14-

provisions outlined therein; specifically, it claims that EyeMart did not provide notice and an opportunity to cure any purported breach as specified by paragraph 7(b) of the Agreement.  EyeMart, however, contends that M&S breached the Agreement by failing to provide the services contracted for; additionally, it contends that Sherman made certain representations "regarding what he would do for Eyemart to implement its strategic plan prior to entering into the Agreement" and thereafter.  As a result, it levies a promissory estoppel claim at M&S as well.  Both parties contend that, on these facts, they are entitled to summary judgment as a matter of law in their favor on both their own claims and those of the opposing party.

Upon consideration of the facts and applicable law, the instant motions are rather easily resolved.  There are, indeed, fundamental factual arguments about whether Sherman and M&S pursued their obligations under the Agreement in an acceptable manner, and it is certainly fair to say that, whatever their actual level of performance thereunder may have been, EyeMart was certainly dissatisfied with it in any event.  These factual differences, however, are immaterial to resolution of the instant motions as a matter of law.  The Court begins with an analysis of M&S's motion for summary judgment on its breach of contract claims.

A. Plaintiff's Motion for Summary Judgment

Neither party disputes the existence or validity of the

contract between the parties.  It is also undisputed that the
contract was breached in some regard by one of the parties.  All
that remains is the determination of where liability for the breach
should lie.  See, e.g., Belcher v. Ohio Dept. Of Human Services,
48 F.Supp.2d 729, 738 (S.D. Ohio 1999)(Marbley, J.), citing
Garofalo v. Chicago Title Ins. Co., 104 Ohio App.3d 95, 108 (1995).
Under Ohio law – which neither party disputes applies –
construction of a clear and unambiguous written contract is a
matter of law for the Court.  See Nationwide Mut. Fire Ins. Co. v.
Guman Bros. Farm, 73 Ohio St. 3d 107, 108 (1995).  Upon review, the
Court agrees with the Plaintiff's contention that EyeMart breached
the Agreement by failing to follow the termination provisions
therein.

        As listed above, the Agreement entitled the parties to
terminate the Agreement for "cause;" in this analysis, the Court
will assume that Sherman's and M&S's alleged failures under the
Agreement were sufficiently egregious to satisfy this standard.  To
this opportunity, however, was tied an obligation: The terminating
party was required to give thirty days' written notice and an
opportunity to cure the alleged breach or breaches of the
Agreement.  Although EyeMart is correct in noting that the
Agreement does not establish any specific requirements of form for
any such notice, these four memoranda, even construed liberally in
favor of EyeMart, simply cannot, as a matter of law, constitute

adequate notice. No mention is made of any breach of the Agreement; no steps are outlined in how they may be remedied, and no time for cure is established at any point.[5] Indeed, the deposition testimony of Herskovitz reveals that EyeMart was aware of the requirement to provide Sherman an opportunity to cure any alleged shortcomings in his performance. No reasonable jury, on these facts, could find that these memoranda constituted "notice" as contemplated by the Agreement. As M&S correctly notes, Ohio law mandates that this Court must impose clear, unambiguous language in a contract that was duly negotiated between the parties. See Construction Interior Sys., Inc. v. Marriott Family Restaurants, Inc., 984 F.2d 749, 754 (6th Cir. 1993), citing Aultman Hosp. Ass'n v. Community Mut. Ins. Co., 46 Ohio St.3d 51, 55 (1989); Ullmann v. May, 147 Ohio St. 468, 475-76 (1947); Transworld Sys., Inc. v. Ohio University, 2003 Ohio 6590 (Ohio Ct. Cl. 2003)(holding notice requirements for termination valid under Ohio law and enforceable if clear).

In opposition, EyeMart raises a number of arguments; all are unavailing. First, it contends that EyeMart's representatives and Sherman were in constant communication during the time at issue

---

[5] The Agreement also imposed the obligation that any "notice" under the Agreement "be delivered in writing in hand or at the address indicated in the first paragraph hereof by certified mail, return receipt requested, or by overnight courier with proof of delivery" (doc. 1). Upon review, it does not appear that M&S avers that it has satisfied this requirement.

and that, as a result, "Sherman cannot now claim that the notices were insufficient and that he was unaware of his breaches" of the Agreement (doc. 61).  It contends that, under Ohio law, failure to follow the explicit terms of the Agreement outlining termination are unnecessary where there is "evidence of constructive or actual notice" or, alternatively, where it would be impossible to cure. See e.g., Daniel E. Terreri & Sons, Inc. v. Board of Mahoning Cty. Commissioners, 152 Ohio App.3d 95, 110 (Mahoning Cty. 2003)(notice); Violante v. Quadland Corp., 1997 WL 531241 (Trumbull Cty. Aug. 29, 1997)(notice); Dwyer v. Unit Power, Inc., 965 S.W.2d 301, 308 (Mo. App. 1998)(futility); Leghorn v. Wieland, 289 So.2d 745, 746 (Fla. App. 1974)(futility);  These cases, however, are easily distinguishable and, in many cases, limited to their facts. For example, in Terreri, the state court was addressing construction cases, and the complaining party in that case expressly acknowledged termination of the contract during the relationship between the parties.  See id., 152 Ohio App.3d at 110. Similarly, in Violante, the court, in reviewing a similar clause, addressed a waiver argument not raised in this case.  As for the arguments of impossibility or futility, they are equally unavailing.  Not only are all of the cases cited non-Ohio cases, but they are clearly distinguishable.  Here, the parties were only a few months into a two-year agreement.  EyeMart readily concedes that the timeframes for achieving specific objectives – to the

extent that they arguably even exist – must have been satisfied within the first year.  Accordingly, none of the alleged failures involved in establishing a desired number and mix of locations were yet ripe.  The ICSC Convention, at best, was merely a means to an end of achieving those goals.  Upon review, the Court finds these assertions meritless.

Finally, Eyemart contends that the termination provisions in paragraph 7(b) of the Agreement are either "nonexclusive" or ambiguous.  The Court cannot agree with either contention.  To the contrary, the provision is clear.  The term "may" in the Agreement clearly refers to the option to exercise the right to terminate the Agreement for cause, not the "option" to serve notice.  To interpret this provision in the way EyeMart advances would be to, in effect, read any and all restrictions on termination out of the contract, a reading that is contrary to not only standard English construction but also the overall intent of the Agreement.  Rather than identifying ambiguity in the Agreement, EyeMart seeks to introduce it.  The Court may not countenance such efforts.  See Construction Interior Sys., 984 F.2d at 754; Nationwide, 73 Ohio St. at 108.  The Court declines to adopt Eyemart's interpretation of the Agreement language, and, based upon the analysis supra, M&S's motion for summary judgment on this ground is well founded.

M&S also moves for summary judgment on the Defendant's counterclaims.  In light of the Court's determination that the

Plaintiff is entitled to summary judgment on its claims, Eyemart's first contention – that M&S breached the Agreement – does not demand detailed analysis. First, even given that Sherman breached the Agreement by failing to perform as contemplated therein, M&S was entitled to notice and an opportunity to cure. Eyemart's failure to provide such notice and opportunity renders it liable for the breach. See, e.g., Transworld Sys., Inc. v. Ohio University, 2003 Ohio 6590 (Ohio Ct. Cl. 2003).

Eyemart also apparently contends, however, in its counterclaim, that M&S and Sherman also made additional representations – both before and after the Agreement was executed – Eyemart now claims were breached. It seeks to enter additional evidence to define these obligations and to hold M&S and Sherman accountable for them. In Ohio, however, the parol evidence rule prohibits the introduction of evidence of either prior or contemporaneous agreements between the parties to alter the terms of a fully integrated, unambiguous contract. See e.g., Galmish v. Cicchini, 90 Ohio St.3d 22, 27 (2000); Ed Schory & Sons, Inc. v. Francis, 75 Ohio St.3d 433 (1996). As noted supra, this Agreement contained an integration clause that further required any changes to the Agreement – such as the subsequent addition of additional terms – be in writing. In light of this requirement, and in light of the Court's finding that this contract is unambiguous, EyeMart's counterclaim on this ground is without merit, and M&S's motion as

-20-

to this ground is well founded.

Finally, M&S contends that EyeMart's promissory estoppel claim fails as a matter of law in light of this Court's finding that a valid contract between the parties exist.  The Court agrees that Ohio law requires such a finding.  Even assuming that the elements for a promissory estoppel claim are established in this case, see, e.g., Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 104 (1985); Nilavar v. Osborn, 127 Ohio App.3d 1, (Clark Cty. 1998); Patrick v. Painesville Commercial Properties, Inc., 123 Ohio App.3d 575, 583 (Lake Cty. 1997), it is unavailable in light of the Court's finding that a valid Agreement exists and that M&S enjoys judgment on its breach of contract claim.  While EyeMart is certainly correct that a party can plead both breach of contract and promissory estoppel claims, see, e.g., Schleicher v. Alliance Corp. Resources, Inc., 1995 WL 723555 at *5 (Franklin Cty. Dec. 7, 1995), this is nothing more than articulation of the general rule that parties may plead in the alternative.  See Fed. R. Civ. P. 8(e)(2).  Promissory estoppel is, generally, a doctrine used to prevent a party from denying the existence of a contract when, for some reason, a formal contract does not indeed exist.  See Mers, 19 Ohio St.3d at 100.  Where, as here, a contract does exist, it seems well resolved that Ohio law precludes recovery under a promissory estoppel claim on the same subject matter and obligations embraced by the contract.  See Terry Barr Sales Agency, Inc. v. All-Lock

-21-

Co., 96 F.3d 174 (6th Cir. 1996); Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 939 (6th Cir. 1989); Schory, 75 Ohio St.3d at 439-40. Accordingly, M&S is entitled to summary judgment in its favor on this counterclaim as well.

B. Defendant's Motion for Summary Judgment

Defendant's motion for summary judgment merely argues the mirror image of every argument raised in Plaintiff's cross-motion. Having resolved all of these arguments in Plaintiff's favor, it is unnecessary to revisit them in the context of Defendant's motion. For the reasons noted supra, Defendant's motion is unfounded, and it will be denied.

C. Motion to Amend

All that remains, therefore, is for this Court to determine whether to grant Defendant's motion to amend its counterclaim to include a claim of fraud. Essentially, Defendant contends that the facts of the instant case justify a finding that Sherman and M&S never intended to perform the services contracted for in the Agreement. Although the Court recognizes that Fed. R. Civ. P. 15(a) imposes a relatively liberal policy favoring amendment of pleadings, there are a number of factors that this Court properly considers when deciding, in its discretion, whether to permit such amendment, including undue delay in filing, lack of notice to the opposing party, bad faith, repeated failure to cure deficiencies by previous amendments, undue prejudice to the

opposing party, and futility of amendment.  See, e.g., Coe v. Bell, 161 F.3d 320, 341-42 (6th Cir. 1998); Brooks v. Celeste, 39 F.3d 125, 130 (6th Cir. 1994).

    This case was originally filed in July 2002.  Although the facts giving rise to EyeMart's initial counterclaim were generally known at that time, it failed to do so, and, instead, waited nine months to request leave to file a counterclaim (doc. 20).  After this Court granted the request and after M&S answered – and after an additional four months had passed – the parties stipulated to allow EyeMart to amend its counterclaim (docs. 25, 26) which this Court again permitted (doc. 27).  After an additional nine months had passed, and after briefing on the instant motions for summary judgment was underway, it filed the instant motion requesting leave to again amend its counterclaims (doc. 52).  In its motion, EyeMart contends that facts discovered during depositions support a claim that Sherman never intended to assist EyeMart at the ICSC Conference and, therefore, give rise to a claim of fraud.  The Court finds these assertions dubious.  It would appear that the general contours of these allegations appear in EyeMart's earlier claims, although they might not have been fully fleshed out by subsequent deposition testimony.  Furthermore, in light of the Agreement between the parties – which, again, establishes, in total, all of their respective obligations – these claims might well be precluded for the same reasons discussed supra

-23-

with respect to the promissory estoppel claims.

In any case, the Court finds that the substantial delay in advancing the proposed amended counterclaim was unreasonable. While it might not rise to the level of bad faith, the Court finds that EyeMart enjoyed the necessary information to advance the claim earlier and that doing so now, while briefing was already underway on the existing claims and discovery was closed, imposes a substantial burden on the Defendant. See, e.g., Semco, Inc. v. Amcast, Inc., 52 F.3d 108, 114 (6th Cir. 1995)(finding no abuse of discretion where district court refused to permit amendment in light of two prior amendments and fact that discovery was closed); see generally Foman v. Davis, 371 U.S. 178, 182 (1962)(holding that district court enjoys broad discretion whether to permit amendment). On these facts, and in light of the prior proceedings in this case, the Court, in its discretion, declines to permit EyeMart to amend its counterclaim yet again.

D. Damages

Having determined supra that M&S is entitled to summary judgment in its favor on its breach of contract claims, all that remains is to calculate the proper amount of damages flowing therefrom. In its briefing, however, EyeMart only contests liability; it does not dispute the amount of the damage award M&S argues is proper. M&S supports its claim with appropriate evidentiary support in the form of an affidavit executed by Martin

Sherman.    Accordingly, the Court finds the amount of requested relief proper.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (doc. 48) is GRANTED.  The Clerk is instructed to enter judgment in favor of the Plaintiff on all claims and counterclaims. Defendant's Motion for Summary Judgment (doc. 49) is DENIED. Defendant's Motion to Amend/Correct Amended Counterclaim (doc. 52) is DENIED.  Plaintiff is hereby AWARDED damages in the amount of four hundred twenty-two thousand seven hundred fifteen dollars and thirty-nine cents ($422,715.39), with appropriate post-judgment interest accruing from the date of entry of judgment.

SO ORDERED.


Dated: October 5, 2004          /s/ S. Arthur Spiegel
                                S. Arthur Spiegel
                                United States Senior District Judge

-25-